1  CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP
   Edward D. Chapin (SBN: 053287)
2  echapin@cfsblaw.com
   Francis A. Bottini, Jr. (SBN: 175783)
3  fbottini@cfsblaw.com
   Keith M. Cochran (SBN: 254346)
4  kcochran@cfsblaw.com
   550 West C Street, Suite 2000
5  San Diego, California 92101
   Telephone:  (619) 241-4810
6  Facsimile:  (619) 955-5318

7  ABRAHAM, FRUCHTER & TWERSKY, LLP
   Ian D. Berg (SBN: 263586)
8  iberg@aftlaw.com
   Takeo A. Kellar (SBN: 234470)
9  tkellar@aftlaw.com
   12526 High Bluff Drive, Suite 300
10 San Diego, California 92130
   Telephone:  (858) 792-3448
11 Facsimile:  (858) 792-3449

12 *Counsel for Plaintiffs*

13 [Additional counsel listed on signature page]

14                UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                 SAN FRANCISCO DIVISION

17 | IN RE DIAMOND FOODS, INC. | Lead Case No.: CV-11-05692 WHA |
   | DERIVATIVE LITIGATION | |
18 | | **CONSOLIDATED SHAREHOLDER** |
   | | **DERIVATIVE COMPLAINT** |
19 | This Document Relates To: | |
   | | **DEMAND FOR JURY TRIAL** |
20 | ALL ACTIONS. | |
   | | (Derivative Action) |
21
22
23
24
25
26
27
28

**SUMMARY OF ACTION**

1.      This is a shareholder derivative action brought on behalf of Nominal Defendant Diamond Foods, Inc. ("Diamond" or the "Company") against the Company's Board of Directors and the Company's auditors relating to breaches of fiduciary duty and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), which occurred between October 5, 2010 and the present (the "Relevant Period").

2.      The Individual Defendants (defined below) breached their fiduciary duties as directors of Diamond by failing to ensure that the Company maintained adequate internal controls and by causing the Company to make materially false and misleading statements concerning the Company's current and future financial condition, in violation of state law and the federal securities laws.

3.      Defendants' breaches of fiduciary duty have caused the Company to be unable to timely file its financial statements, necessitated an expensive and time-consuming internal investigation at the Company, destroyed the Company's $2.35 billion acquisition of the Pringles division of The Procter & Gamble Company ("P&G") (which would have doubled Diamond's annual revenues), caused analysts, such as Jefferies, to slash their price targets for the Company's stock, and tarnished the Company's reputation with shareholders and the investment community as well as with suppliers.

4.      During the Relevant Period, Defendants caused the Company to misrepresent Diamond's current financial condition and prospective financial results, including but not limited to: (a) reported earnings and expenses incurred during the Company's fiscal years 2010 and 2011; (b) fiscal 2012 projected revenue and earnings and the timing thereof; and (c) overall shareholder value related to a proposed acquisition of P&G's Pringles business, which was originally scheduled to close by December 2011.

5.      Accounts by confidential witnesses demonstrate that the Company's accounting for, and explanation of, alleged "momentum payments" made in August 2010 and September 2011 were clearly false and represented a basic accounting fraud pursuant to which the Company's executives and directors intentionally deferred recognizing substantial expenses (payments to walnut growers

1  for their crops) to the next fiscal year in order to artificially inflate the Company's reported profits

2  and earnings per share.  A former high-level Diamond employee ("CW1"), who worked at the

3  Company in domestic sales for nearly 10 years and worked closely with Defendant Michael Mendes,

4  Diamond's former CEO, noted that the Company had never made "momentum payments" to

5  growers.  Instead, the growers were paid on a timetable where the growers would receive three

6  payments – one payment in October, one payment in January, and one payment in March.  Further,

7  CW1 noted Diamond would never pay growers in advance.

8      6.      As demonstrated below, the Individual Defendants benefitted from the improper

9  accounting that resulted in the claims brought in this action.  Diamond's fiscal year runs from

10 August 1st to July 31st.  On February 8, 2012, Diamond admitted that $60 million in payments made

11 to walnut growers during September 2011, and deemed to be expenses in fiscal year 2012 (which

12 fiscal year started August 1, 2011) were actually payments for the fiscal year 2011 walnut crop and

13 should have been recognized as expenses in fiscal year 2011 rather than deferred to fiscal year 2012.

14 Similarly, $20 million in payments made to walnut growers in August 2010 were admitted to not be

15 fiscal year 2011 expenses, as they had been recorded, but were part of the fiscal year 2010 expenses

16 that were improperly recorded in fiscal year 2011.  During the time of this improper accounting,

17 three members of the Company's Board had associations with walnut growers and received benefits

18 from the payments made to walnut growers.  In addition, two other members of the Company's

19 Board were also officers of Diamond and received additional compensation because the improper

20 accounting falsely showed the Company's earnings to be higher.  All of Diamond's directors were

21 awarded stock options, which became significantly more valuable because the improper accounting

22 artificially increased fiscal year 2010 and fiscal year 2011 earnings.

23     7.      On November 1, 2011, after earlier claiming that the September 2011 payment was a

24 momentum payment for the fiscal year 2012 walnut crop, Diamond issued a press release

25 announcing that the Audit Committee of the Board of Directors was conducting an internal

26 investigation into payments made to walnut growers in September 2011 and the accounting for such

27 payments.  In addition, the Company stated that in light of the accounting investigation, the

28 acquisition of P&G's Pringles business scheduled to close in December 2011 would be delayed to

1    mid-2012. The Company's stock price plummeted 17% on this news to close at $52.79 per share on

2    November 2, 2011, down from a close of $64.12 per share on November 1, 2011, on massive trading

3    volume

4         8.    On November 5, 2011, *Barron's Online* published an article entitled "Getting to the

5    Nut of the Problem."  The article discussed in detail the Company's September 2011 "momentum

6    payment" to walnut growers and suggested that the Company may have overstated its fiscal 2011

7    financial results.

8         9.    On November 7, 2011, following these disclosures, Diamond's stock price continued

9    to decline on substantial trading volume, falling to a close of $39.09 per share, a 15% decline from

10   its Friday, November 4, 2011 close of $46.40 per share.

11        10.   Diamond shares also tumbled on November 23, 2011 after CNBC reported that

12   company director Joseph Silveira committed suicide on Nov. 15, 2011. Silveira had served on the

13   Audit Committee, which was both responsible for the integrity of the Company's financial

14   statements and then assumed responsibility for investigating the alleged misrepresentations in the

15   Company's previously reported financial results.  Silveira had recused himself from the

16   investigation.

17        11.   On December 12, 2011, the Individual Defendants caused Diamond to file a press

18   release and Form 8-K stating that the Company would be unable to timely file its quarterly financial

19   statements. In the press release, the Company stated that: "Diamond expects to receive a notice of

20   deficiency from the Nasdaq Listing Qualifications Department, indicating that Diamond is not in

21   compliance with Nasdaq Listing Rule 5250(c)(1)."

22        12.   On December 15, 2011, Diamond announced that on the preceding day, it had

23   received a formal order of investigation from the United States Securities and Exchange Commission

24   ("SEC") relating to whether the Company violated accounting rules in connection with payments

25   made to walnut growers. Most SEC investigations are "informal."  Formal investigations are more

26   serious and rare.

27        13.   In response to the revelation of the formal SEC investigation, the Company's stock

28   price declined and Jefferies downgraded its rating on the stock to hold from buy and cut its price

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 3 -

1    target to $27 from $46.  Forbes published an article on December 15, 2011 noting that "The stock

2    has been hit with staggering losses in recent months, as investigations into 'momentum payments'

3    made to some of the company's vendors has postponed an important acquisition of Pringles from

4    Procter &_Gamble."

5        14.     During the Relevant Period, the Company's stock traded at artificially inflated prices

6    due to Defendants' wrongdoing, reaching a high price of $92.47 per share on September 20, 2011.

7        15.     On January 13, 2012, it was revealed that prosecutors in the white-collar division of

8    the United States Attorney's Office in San Francisco opened an inquiry into whether financial

9    practices at Diamond involved criminal fraud.

10       16.     On February 8, 2012, the Defendants who comprise the current Board caused

11    Diamond to file a press release and Form 8-K stating that the Company's previously issued

12    consolidated financial statements for the fiscal years ended July 31, 2010 and July 31, 2011 should

13    no longer be relied upon.  The Audit Committee had determined that a $20 million payment to

14    walnut growers in August 2010 and a $60 million payment to walnut growers in September 2011

15    had not been accounted for correctly.  The press release also disclosed that Diamond had one or

16    more material weaknesses in its internal control over financial reporting.  On this news, Diamond's

17    stock plummeted from $36.66 per share on February 8, 2012 to close at $23.13 per share on

18    February 9, 2012, a 37% drop in just one day.

19       17.     Also in its February 8, 2012 press release and Form 8-K, Diamond stated that

20    Michael J. Mendes ("Mendes") and Steven M. Neil ("Neil") were placed on administrative leave

21    from their positions as President and Chief Executive Officer ("CEO") of Diamond, and Executive

22    Vice President, Chief Financial Officer ("CFO") and Chief Administrative Officer of Diamond,

23    respectively.  It was not disclosed why Mendes and Neil were placed on administrative leave.

24       18.     Then on February 15, 2012, the Diamond Board caused Diamond to file a press

25    release and Form 8-K stating that Diamond and P&G had terminated the agreement in which

26    Diamond was to acquire the Pringles division.  P&G also announced that the acquisition had

27    terminated and that it would now sell its Pringles division to the Kellogg Company in a $2.7 billion

28    all-cash transaction.

19.     Plaintiffs bring this derivative action to (i) recover damages against Diamond's directors and its auditor for the benefit of the Company and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect Diamond and its shareholders from a repeat of the damaging events described below.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise in part under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and SEC regulation 14a-9 promulgated thereunder.   Jurisdiction is conferred by the Exchange Act, and supplemental jurisdiction over Plaintiffs' state law claims is conferred by 28 U.S.C. §1367.

21.     Venue is proper pursuant to the Exchange Act.  Diamond's headquarters are located in San Francisco, California, and the false statements were made in this District.

22.     The Court has jurisdiction over each named defendant because such defendants are either entities which conduct business in and maintain offices in this District or individuals who have sufficient minimum contacts with California so as to render the exercise of jurisdiction by this Court permissible.

23.     A substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongs alleged herein, occurred in this District. Diamond's headquarters are located in San Francisco, California, one or more of the individual defendants reside in San Francisco, and the acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

24.     Plaintiff Dave Lucia ("Lucia") is a current shareholder of Diamond Foods and has continuously held Diamond common stock during the entire Relevant Period.  Plaintiff Lucia first acquired his Diamond common stock on June 3, 2008 and has continuously held the shares since that time.

25.     Plaintiff Board of Trustees of City of Hialeah Employees' Retirement System ("Hialeah") is a current shareholder of Diamond Foods and has continuously held Diamond common

1   stock during the entire Relevant Period.  Plaintiff Hialeah first acquired its Diamond common stock

2   in November 2008 and has continuously held the shares since that time.

3       26.    Defendant Diamond is a Delaware corporation with its principal place of business at

4   600 Montgomery Street, Suite 1300, San Francisco, California 94111.  Diamond sells snack

5   products to global, national, regional and independent grocery, drug and convenience store chains, as

6   well as to mass merchandisers and club stores.  Defendant Diamond maintains its corporate

7   headquarters in San Francisco, California.

8       27.    Defendant Michael J. Mendes was, at all relevant times during the Relevant Period,

9   Chairman of the Board of Directors, President and CEO of the Company, and signed the Company's

10   October 5, 2010 Form 10-K and September 15, 2011 Form 10-K filed with the SEC. Mr. Mendes

11   has served as Diamond's President and CEO since 1997. Mr. Mendes joined Diamond in 1991 and

12   served as Diamond's Vice President of International Sales and Marketing prior to being appointed as

13   Diamond's CEO. Mr. Mendes served as Manager of International Marketing of the Dole Food

14   Company from 1989 to 1991. On February 7, 2012, Mr. Mendes was placed on administrative leave

15   from his positions as President and CEO of Diamond, but retains his board seat.

16       28.    Defendant Steven M. Neil has served as Diamond's Executive Vice President, CFO

17   and Chief Administrative Officer since March 2008.  In addition, Mr. Neil has served on the

18   Diamond Board since 2005. Prior to joining Diamond, from April 2007 until March 2008, Mr. Neil

19   was Executive Vice President and CFO of The Cooper Companies, Inc., a company that

20   manufactures specialty healthcare products, and from 2005 to April 2007, he was Vice President and

21   CFO of The Cooper Companies. From 2003 to 2005, Mr. Neil served as Executive Vice President,

22   CFO and Secretary of Ocular Sciences, Inc., a contact lens company. From 1997 to 2003, Mr. Neil

23   was Executive Vice President, Finance, CFO, Treasurer and Secretary of Sola International, a

24   marketer of eyeglass lenses.  Neil is a citizen of the State of California.  On February 7, 2012, Mr.

25   Neil was placed on administrative leave from his positions as Executive Vice President, CFO and

26   Chief Administrative Officer of Diamond, but retains his board seat.

27       29.    Defendant Laurence M. Baer ("Baer") is a director of the Company and member of its

28   Compensation Committee and Nominating and Corporate Governance Committee.  He has been a

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT    - 6 -

director of the Company since 2005. Mr. Baer has been the President of the San Francisco Giants, a major league baseball team, since 2008. Prior to serving as President, he was Executive Vice President of the Giants since 1992 and was its Chief Operating Officer since 1996.

30.     Defendant Edward A. Blechschmidt ("Blechschmidt") is a director of the Company and member of its Audit Committee. He has been a director of the Company since 2008.

31.     Defendant John J. Gilbert ("Gilbert") is a director of the Company. Mr. Gilbert has served as a director of Diamond since 2005 and as Diamond's Chairman Emeritus since January 2010. He served as the Chairman of the Diamond Board from 2005 to January 2010 and was Chairman of the Board of Diamond's predecessor company, Diamond Walnut Growers, from 1996 to 2005. Since 1983, Mr. Gilbert has been the owner and President of Gilbert Orchards and Rio Oso Groves, Inc., each of which is a family corporation focusing on walnuts. In connection with his interests in these walnut growing entities, Mr. Gilbert received payments from Diamond as a walnut grower or an affiliate of a walnut grower in 2010 of $1,916,048 and in 2011 of $2,744,476.

32.     Defendant Glen C. Warren, Jr. ("Warren") is a director of the Company and member of its Compensation Committee and Nominating and Corporate Governance Committee.

33.     Defendant Richard G. Wolford ("Wolford") is a director of the Company and member of its Audit Committee, and has served as a director since April 2011. On February 7, 2012, Mr. Wofford was appointed to serve as Diamond's Acting President and CEO.

34.     Defendant Robert J. Zollars ("Zollars") is a director of the Company and member of its Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. He was appointed as Diamond's Chairman of the Board, replacing Mendes, on February 8, 2012.

35.     Defendant Robert M. Lea ("Lea") has served as a director of Diamond since 2005 and was a member of the Board of Directors of Diamond's predecessor company, Diamond Walnut Growers, from 1993 to 2005. Since 2004, Mr. Lea has practiced law as a solo practitioner with the Law Offices of Robert Lea, which he founded. During 2004, Mr. Lea served as the Managing Partner of Lea and Shepherd, a law firm. From 1984 to 2003, Mr. Lea was a partner of the law firm Lea & Arruti. Mr. Lea holds a B.A. from the University of California, Davis and a J.D. from the

1　University of California, Berkeley, School of Law (Boalt Hall). Lea received payments from

2　Diamond in connection with being a walnut grower or an affiliate of a walnut grower in 2010 of

3　$557,853 and in 2011 of $844,487.

4　　　36.　　Defendant the Estate of Joseph P. Silveira is named as a defendant because Joseph P.

5　Silveira ("Silveira") died on November 15, 2011. Silveira was a director of Diamond and member

6　of its Audit Committee during the Relevant Period and until on or about the day he died. Silveira

7　had served as a director of Diamond since 2005 and was a member of the Board of Directors of

8　Diamond's predecessor company, Diamond Walnut Growers, from 2002 to 2005. Mr. Silveira also

9　served on the Board of Valley Fig Growers from 1992 to 2004, an agricultural cooperative, and

10　while on that Board, he also served on the Board of Directors of Sun Diamond, a master cooperative

11　organization that included Diamond Walnut Growers. Since 1994, Mr. Silveira had served as

12　President of Farmland Management Services, Inc. ("Farmland"), an agricultural services company,

13　directing property acquisitions, operations, leases and sales on behalf of clients including large

14　institutional investors. One of Farmland's clients is John Hancock, an insurance company, which

15　operates farming assets, including walnut orchards from which Diamond purchased walnuts.

16　Silveira received management fees from John Hancock. Mr. Silveira held a B.S. from California

17　Polytechnic State University, San Luis Obispo. Silveira approved the Company's 2010 Form 10-K

18　and the September 26, 2011 Proxy Statement relating to the merger between Diamond and the

19　Pringles division of P&G. References herein that refer to or include Silveira, are references to his

20　estate, including the executor or administrator of his estate, where applicable.

21　　　37.　　Defendant Dennis Mussell ("Mussell") served as a director of Diamond from 2005

22　until his retirement in March 2011. He also served as a member of Diamond's Audit Committee

23　until March 2011.

24　　　38.　　Mendes, Neil, Baer, Blechschmidt, Gilbert, Warren, Wolford, Zollars, Mussell,

25　Silveira, and Lea are referred to herein as the "Individual Defendants." The Individual Defendants,

26　other than Mussell and Silveira, compose the current Diamond Board.

27　　　39.　　Defendant Deloitte & Touche LLP ("Deloitte & Touche) is an accounting firm and

28　served as Diamond's independent outside auditor during the Relevant Period. Deloitte & Touche

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT　　　　　　　　　　- 8 -

1    audited Diamond's year-end financial results for the fiscal years ended July 31, 2011 and July 31,
2    2010.
3                                    **CONTROL PERSONS**
4            40.    As officers, directors and controlling persons of a publicly held company whose
5    common stock was and is traded on the NASDAQ and which is governed by the provisions of the
6    federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate
7    and truthful information with respect to the Company's financial condition, performance, growth,
8    operations, financial statements, business, markets, management, earnings and present and future
9    business prospects, and to correct any previously issued statements that had become materially
10   misleading or untrue, so that the market price of the Company's stock would be based upon truthful
11   and accurate information. The Individual Defendants' misrepresentations and omissions during the
12   Relevant Period violated these specific requirements and obligations.
13           41.    The Individual Defendants participated in the drafting, preparation, and/or approval
14   of the various public SEC filings, shareholder and investor reports and other communications
15   complained of herein and were aware of, or recklessly or negligently disregarded, the misstatements
16   contained therein and omissions therefrom, and were aware of their materially false and misleading
17   nature. Because of their Board membership and/or executive and managerial positions with
18   Diamond, each of the Individual Defendants had access to the adverse undisclosed information about
19   Diamond's financial condition and performance as particularized herein and knew (or recklessly or
20   negligently disregarded) that these adverse facts rendered the positive representations made by or
21   about Diamond and its business or adopted by the Company materially false and misleading.
22           42.    The Individual Defendants, by virtue of serving as officers and/or directors of the
23   Company, owed fundamental fiduciary duties of due care, loyalty, candor and good faith to the
24   Company and its shareholders in connection with the operations, management and supervision of the
25   Company. The Individual Defendants had a duty to disseminate accurate and truthful information to
26   the public regarding the business and finances of Diamond. The Individual Defendants, because of
27   their positions of control and authority as officers and/or directors of the Company, and while they
28   held those positions, were able to and did control the content of the various SEC filings, press

1  releases and other public statements pertaining to the Company issued during the Relevant Period,

2  including but not limited to the 2010 Form 10-K, the 2011 Form 10-K, the November 26, 2010

3  Proxy Statement, and the September 26, 2011 Proxy Statement. Each Individual Defendant, while

4  he held his position with Diamond, was provided with copies of the documents alleged herein to be

5  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

6  their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

7  responsible for the accuracy of the public reports and releases detailed herein, during the time they

8  held their positions with Diamond, and is therefore primarily liable for the representations contained

9  therein.

10                                          **BACKGROUND**

11        43.      Diamond was incorporated in Delaware in 2005 as the successor to Diamond Walnut

12  Growers, Inc., a member-owned California agricultural cooperative association. In July 2005,

13  Diamond Walnut Growers, Inc. merged with and into Diamond Foods, Inc., converted from a

14  cooperative association to a Delaware corporation, and completed an initial public offering of

15  Diamond common stock. The Company specializes in processing, marketing and distributing snack

16  products and culinary, in-shell and ingredient nuts. The Company sells its products through the

17  following product categories:

18        (a)      <u>Snack</u>. The Company sells snack products under the Emerald®, Pop Secret®

19  and Kettle Brand® brands. Emerald products include roasted, glazed and flavored nuts, trail mixes,

20  seeds, dried fruit and similar offerings packaged in resealable containers. Pop Secret microwave

21  popcorn from General Mills is offered in a variety of traditional flavors, as well as a "better-for-you"

22  product offering featuring 100-calorie packs. Kettle Brand is a leading premium potato and tortilla

23  chip company.

24        (b)      <u>Culinary and Retail In-shell</u>. The Company sells culinary nuts under the

25  Diamond of California® brand in grocery store baking aisles and produce aisles and through mass

26  merchandisers and club stores. Culinary nuts are marketed to individuals who prepare meals or

27  baked goods at home and who value fresh, high-quality products. Diamond also sells in-shell nuts

28  under the Diamond of California® brand, primarily during the winter holiday season.

1            (c)    <u>Non-Retail</u>. The Company markets ingredient nuts internationally under the

2    Diamond of California® brand to food processors, restaurants, bakeries and food service companies

3    and their suppliers.

4                      **SUBSTANTIVE ALLEGATIONS**

5        44.    During the Relevant Period, the Audit Committee of Diamond's Board was initially

6    comprised of Defendants Blechschmidt, Silveira and Mussell until March 4, 2011, when Mussell

7    resigned. At that time, Defendant Warren replaced Mussell on the Audit Committee. On April 27,

8    2011, Defendant Wolford was appointed to the Diamond Board and joined the Audit Committee.

9    Defendants Blechschmidt, Wolford and Silveira then comprised the Audit Committee until on or

10   about November 15, 2011 when Silveira died. He was then replaced on the Audit Committee by

11   Defendant Zollars during November 2011. The principal functions of Diamond's Audit Committee

12   are to:

13       • oversee the integrity of accounting and financial reporting processes of the issuer
     and the audits of the financial statements of the issuer;

14

15       • monitor the periodic reviews of the adequacy of the accounting and financial
     reporting processes and systems of internal control that are conducted by the
     Company's independent auditors and the Company's financial and senior
16   management;

17

18       • review and evaluate the independence and performance of the Company's
     independent auditors; and

19

20       • facilitate communication among the Company's independent auditors, the
     Company's financial and senior management and the Board.

21       45.    In order to serve these functions, Defendants Blechschmidt, Zollars, Mussell, Silveira,

22   Warren and Wolford had, according to the Audit Committee Charter, "unrestricted access to

23   Company personnel and documents, and will have authority to direct and supervise an investigation

24   into any matters within the scope of its duties."

25       46.    Although Audit Committee members are supposed to be independent and have

26   expertise in financial matters and accounting principles, Silveira was not independent and had no

27   educational background or practical experience in finance or accounting. Other members also

28   lacked the requisite experience to be on the Audit Committee. The Audit Committee Charter

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT        - 11 -

1   explicitly stated that "Each member of the Committee will meet the independence, financial

2   sophistication and experience requirements of the Securities Exchange Act of 1934, the rules and

3   regulations promulgated thereunder by the Securities and Exchange Commission ("*Commission*")

4   and The NASDAQ Stock Market, as they may be amended from time to time ("*Rules*"), except as

5   otherwise permitted by such Rules. Each member of the Committee will have the ability to read and

6   understand fundamental financial statements."

7         47.        Defendants Blechschmidt, Zollars, Mussell, Silveira, Warren and Wolford also had a

8   duty to review, discuss, and approve the Company's annual and quarterly financial statements and to

9   review and approve information about Diamond's finances and operational results given to analysts

10   and rating agencies.   The Audit Committee Charter notes the following specific duties of

11   Blechschmidt, Zollars, Mussell, Silveira, Warren and Wolford:

**A. Financial Statements and Disclosures**
The Committee will:

1. *Review and discuss with management quarterly and annual results and the type and presentation of information to be included in the Company's related earnings press release prior to distribution to the public.*

2. *Review the Company's quarterly and annual financial statements, including any report on the Company's internal control over financial reporting,* and any report or opinion by the independent auditors prior to distribution to the public or filing with the Commission.

3. In connection with the Committee's review of the annual financial statements:

• Discuss with the independent auditors, any internal audit department and management the financial statements and the results of the independent auditors' audit of the financial statements.

• Discuss any items required to be communicated by the independent auditors in accordance with Statement on Auditing Standards ("*SAS*") No. 61, Communication With Audit Committees (Codification of Statements on Auditing Standards, AU § 380), as amended. These discussions should include the independent auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements and any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information.

• Discuss with management and the independent auditors the Company's selection, application and disclosure of critical accounting policies and practices.

4. **Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K.**

5. In connection with the Committee's review of the quarterly financial statements:

• **Discuss with the independent auditors and management the results of the independent auditors' SAS No. 100, Interim Financial Information** (Codification of Statements on Auditing Standards, AU § 722) or similar review of the quarterly financial statements.

• **Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with management and the independent auditors,** including resolution of any disagreements among management and the independent auditors regarding financial reporting.

6. **Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies.**

7. **Review any (i) significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting or (ii) fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting** that are disclosed to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer in connection with such officers' periodic review of the Company's internal controls over financial reporting.

## 2010 Earnings and the 2010 Form 10-K

48.     On October 5, 2010, Individual Defendants Mendes, Neil, Blechschmidt, Lea, Warren, Mussell, Gilbert, Baer, Silveira, and Zollars caused the Company to issue a press release announcing its fourth quarter 2010 and fiscal year 2010 financial results. The press release stated in relevant part:

**SAN FRANCISCO, CA, October 5, 2010** — Diamond Foods, Inc. (NASDAQ: DMND) today reported record financial results for its fourth quarter and full year of fiscal 2010.

For the three months ended July 31, 2010 net income grew 60 percent to $6.7 million and fully diluted earnings per share (EPS) grew 20 percent over the prior year's quarter to $0.30, despite a 34 percent higher share count. Excluding $1.3 million in

acquisition and integration costs related to the purchase of Kettle Foods in March, non-GAAP EPS was up 36 percent to $0.34 compared to $0.25 for the prior year's quarter.

For the twelve months ended July 31, 2010 net income grew 10 percent over the prior year period to $26.2 million and EPS was $1.36. Excluding $14.1 million, net of tax credits, in acquisition, integration and debt retirement costs primarily related to the purchase of Kettle Foods in March, non-GAAP earnings grew 52 percent to $36.8 million, and non-GAAP EPS grew 32 percent to $1.91.

"We successfully acquired and integrated Kettle Foods while driving strong organic growth in our base business, delivering 52 percent earnings growth for the year," said Michael J. Mendes, Chairman, President and CEO. "For 2010, our snack sales grew 70 percent and are projected to exceed $540 million this year, 25 times larger than when we went public in 2005."

49.    On October 5, 2010, the Individual Defendants (other than Wolford) caused the Company to file its Form 10-K for the period ending July 31, 2010 with the SEC (the "2010 Form 10-K"). The 2010 Form 10-K stated that the Company's financial statements were in compliance with GAAP.   The 2010 Form 10-K was signed by Individual Defendants Mendes, Neil, Blechschmidt, Zollars, Lea, Warren, Mussell, Gilbert, Silveira, and Baer.

50.    The 2010 Form 10-K reported the following revenues, expenses, and net income for fiscal year 2010:

### DIAMOND FOODS, INC.

### CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Year Ended July 31, | | |
|  | 2010 | 2009 | 2008 |
|  | (In thousands, except per share information) | | |
| Net sales | $680,162 | $570,940 | $531,492 |
| Cost of sales | 519,161 | 435,344 | 443,490 |
| Gross profit | 161,001 | 135,596 | 88,002 |

| Operating expenses: | | | |
|---|---|---|---|
| Selling, general and administrative | 64,301 | 60,971 | 43,613 |
| Advertising | 32,962 | 28,785 | 20,508 |
| Acquisition and integration related expenses | 11,508 | — | — |
| Total operating expenses | 108,771 | 89,756 | 64,121 |
| Income from operations | 52,230 | 45,840 | 23,881 |
| Interest expense, net | 10,180 | 6,255 | 1,040 |
| Other expense, net | 1,849 | 898 | — |
| Income before income taxes | 40,201 | 38,687 | 22,841 |
| Income taxes | 13,990 | 14,944 | 8,085 |
| Net income | $26,211 | $23,743 | $14,756 |
| Earnings per share | | | |
| Basic | $1.40 | $1.45 | $0.92 |
| Diluted | $1.36 | $1.42 | $0.91 |
| Shares used to compute earnings per share | | | |
| Basic | 18,313 | 16,073 | 15,767 |
| Diluted | 18,843 | 16,391 | 15,825 |

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Dividends declared per share | $0.18 | $0.18 | $0.18 |

51. The October 5, 2010 press release and the Form 10-K for the period ending July 31, 2010 were materially false and misleading, as the Company subsequently admitted, because $20 million worth of crop payments made to walnut growers in August 2010 were accounted for in the wrong period. The Company had a contractual obligation to pay the $20 million crop payments in fiscal year 2010. Under Generally Accepted Accounting Principles, expenses must be recognized in the fiscal year that they are incurred. Thus, the $20 million crop payments were expenses that the Company should have recognized as expenses in fiscal year 2010. The Company's deferral of these expenses until fiscal year 2011 enabled the Company to understate its expenses in fiscal year 2010 by $20 million, artificially inflating the Company's reported profits and earnings per share.

52. Defendant Deloitte & Touche signed Diamond's 2010 Form 10-K, in which it gave Diamond an unqualified audit opinion and stated that Diamond's financial results complied with GAAP in all respects and that the Company maintained effective internal control over financial reporting as of July 31, 2010. The 2010 Form 10-K included the following signed statement from Deloitte & Touche:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
Diamond Foods, Inc.
San Francisco, California

We have audited the accompanying consolidated balance sheets of Diamond Foods, Inc. and subsidiaries (the "Company") as of July 31, 2010 and 2009, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended July 31, 2010. We also have audited the Company's internal control over financial reporting as of July 31, 2010, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. As described in "Management's Report on Internal Control over Financial Reporting", management excluded from its assessment the internal control over financial reporting at Kettle Foods, which was acquired on March 31, 2010 and whose financial statements constitute less than 10% of consolidated assets, and less than 15% of consolidated net sales of the consolidated financial statement amounts as of and for the year ended July 31, 2010. Accordingly, our audit did not include the internal control over financial reporting at Kettle Foods. The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying

"Management's Report on Internal Control over Financial Reporting." Our responsibility is to express an opinion on these financial statements and an opinion on the Company's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

***

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Diamond Foods, Inc. and subsidiaries as of July 31, 2010 and 2009, and the results of their operations and their cash flows for each of the three years in the period ended July 31, 2010, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of July 31, 2010, based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

/s/ Deloitte & Touche LLP
San Francisco, California
October 5, 2010

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 17 -

53.     Deloitte & Touche's certification was materially false and misleading because Diamond's 2010 Form 10-K did not comply with GAAP and the Company did not maintain effective internal control over financial reporting.  The 2010 Form 10-K for the period ending July 31, 2010 failed to properly account for $20 million worth of crop payments made to walnut growers in August 2010.  The payments represented expenses that, admittedly, should have been included in 2010 fiscal year, but instead were improperly deferred until the first quarter of the 2011 fiscal year.

**The 2010 Proxy Statement**

54.     On November 26, 2010, the Individual Defendants (other than Wolford) caused Diamond to issue a definitive Proxy Statement which solicited Diamond shareholders to vote at the 2011 annual meeting of stockholders (the "2010 Proxy Statement").

55.     The 2010 Proxy Statement represented that the Audit Committee had reviewed the audited financial statements to be included in the Annual Report on Form 10-K for the fiscal year ended July 31, 2010 and that management represented that the financial statements were prepared in accordance with GAAP and that the Company maintained effective internal controls.  The 2010 Proxy Statement stated in pertinent part:

### REPORT OF THE AUDIT COMMITTEE

The Audit Committee is comprised of Ed A. Blechschmidt, Joseph P. Silveira and Dennis Mussell, all of whom have been determined to be independent by the Board under the applicable NASDAQ listing requirements and SEC rules. The Board also has determined that Mr. Blechschmidt is an Audit Committee financial expert as defined by the SEC rules. The committee operates under a written charter adopted by the Board of Directors. A copy of the Audit Committee's charter is available on Diamond Foods' website at http://www.diamondfoods.com or to any stockholder upon written request to the Company at Investor Relations, Diamond Foods, Inc., 600 Montgomery Street, 17th Floor, San Francisco, CA 94111.

The primary function of the Audit Committee is to provide advice with respect to Diamond Foods' financial matters and to assist the Board in fulfilling its oversight responsibilities regarding (i) the quality and integrity of Diamond Foods' financial statements, (ii) compliance with legal and regulatory requirements, (iii) the qualifications and independence of the independent registered public accounting firm serving as Diamond Foods' auditors and (iv) the performance of Diamond Foods' internal audit function and the independent auditors.

Management is responsible for Diamond Foods' internal controls and the financial reporting process. The independent auditors are responsible for performing an independent audit of Diamond Foods' consolidated financial statements in

accordance with generally accepted auditing standards and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

The Audit Committee reviewed and discussed the audited financial statements of Diamond Foods for the fiscal year ended July 31, 2010 with management, and management represented that the financial statements of Diamond Foods were prepared in accordance with accounting principles generally accepted in the United States of America. Management has also represented that they have assessed the effectiveness of the Company's internal controls over financial reporting as of July 31, 2010 and determined that as of that date, the company has maintained effective internal control over financial reporting. The Audit Committee discussed with Deloitte & Touche LLP, our independent registered public accounting firm ("D&T"), matters required to be discussed by Statement on Auditing Standards ("SAS") No. 61 (Communication with Audit Committees) as amended by SAS No. 91.

The Audit Committee has (1) reviewed and discussed the audited financial statements with management, (2) discussed with D&T the matters required to be discussed by SAS No. 61, (3) received the written disclosures and the letter from D&T required by applicable requirements of the Public Company Accounting Oversight Board, and has discussed the auditors' independence with D&T and (4) reviewed and discussed with management and D&T management's assertions regarding internal financial controls. Based upon these discussions and reviews, the Audit Committee recommended to the Board that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended July 31, 2010 filed with the SEC.

*Respectfully submitted by the members of the Audit Committee of the Board of Directors.*

> Edward A. Blechschmidt, Chairman
> Joseph P. Silveira
> Dennis Mussell

56.     These statements in the 2010 Proxy Statement concerning Diamond's financial results, internal controls, and compliance with GAAP in fiscal year 2010 were false and misleading because the Annual Report on the 2010 Form 10-K did not comply with GAAP, improperly accounted for $20 million of payments to walnut growers, and falsely stated that Diamond maintained adequate internal controls. The Company had a contractual obligation to pay the $20 million crop payments in fiscal year 2010. Under Generally Accepted Accounting Principles, expenses must be recognized in the fiscal year that they are incurred. Thus, the $20 million crop payments were expenses that the Company should have recognized as an expense in fiscal year 2010. This enabled the Company to understate its expenses in fiscal year 2010 by $20 million and thus also overstate its profits and earnings per share.

**First Quarter Fiscal 2011 Reported Results**

57.     On December 8, 2010, the Individual Defendants (other than Wolford) caused the Company to issue a press release announcing its first quarter fiscal 2011 financial results in which the Company reported a 40% increase in sales and increased its revenue and earnings guidance for fiscal 2011. The press release stated as follows:

**Diamond Reports a 40% Increase in Sales and Raises Guidance**

- Retail net sales grew 58%, led by a 130% increase in snack sales;

- Raising full-year sales guidance to $920 million to $945 million;

- Raising full-year EPS guidance to $2.43 to $2.49.

. . . Diamond Foods, Inc. today reported strong financial performance for its first quarter of fiscal 2011 and increased guidance for the full-year.

For the three months ended October 31, 2010, net sales grew 40 percent, with retail sales growing 58 percent to $227.8 million and snack sales increasing 130 percent to $137.6 million. Non-retail sales declined 32 percent to $24.8 million due primarily to the later tree nut harvest. Operating income increased 7 percent to $27.5 million, which includes a 98 percent increase in advertising for the quarter compared to the prior year. Fully diluted earnings per share (EPS) was $0.64, and excluding integration costs related to the acquisition of Kettle Foods, non-GAAP EPS was $0.65.

"We are pleased with the organic growth in our base retail business, which has been augmented by the addition of Kettle," said Michael J. Mendes, Chairman, President and CEO. "Our strong performance gives us the confidence to further invest in our brands while increasing our sales and earnings guidance."

*     *     *

**Financial Highlights**

For the quarter, gross profit as a percentage of net sales was 25.2 percent.

Selling, general and administrative expense (SG&A) was $23.1 million during the quarter, or 9.1 percent of net sales compared to 7.5 percent of net sales during the prior year's period.

*     *     *

**Financial Outlook**

For the second quarter of fiscal 2011, we expect sales of between $255 million and $265 million and non-GAAP EPS of between $0.85 and $0.91, reflecting an increase in first half of fiscal year guidance from $1.45 to $1.55 per share to $1.50 to $1.56 per share compared to $1.35 per share last year.

For the full year of fiscal 2011, we now expect sales of between $920 million and $945 million compared to $910 million and $940 million previously, which implies growth of 35 percent to 39 percent above fiscal 2010. We expect non-GAAP EPS to range from $2.43 to $2.49 compared to $2.38 to $2.48 previously. This implies net income growth of between 48 percent and 51 percent over fiscal 2010 non-GAAP results.

58.     On December 8, 2010, the Individual Defendants (other than Wolford) caused the Company to file its quarterly report on Form 10-Q with the SEC. The Form 10-Q was signed by defendant Neil and repeated and expanded upon the financial results in the December 8, 2010 press release. The Form 10-Q also discussed the manner in which the Company received and paid for walnuts used in its consumer snack products, including but not limited to stating that the purchase price to be paid to walnut growers would be determined by Diamond in good faith.

59.     After the December 8, 2010 earnings release and Form 10-Q were issued, the Company's stock price increased from a close of $45.82 per share on December 8, 2010 to a close of $50.59 per share on December 9, 2010.

**Second Quarter Fiscal 2011 Reported Results**

60.     On March 8, 2011, the Individual Defendants (other than Mussell and Wolford) caused the Company to issue a press release announcing its financial results for its second quarter of fiscal 2011, reporting record results and again increasing the Company's financial guidance for fiscal year 2011:

**Diamond Reports Record Sales and Earnings and Increases Guidance**

- Retail net sales grew 63 percent, fueled by the addition of Kettle and double-digit organic snack sales growth;

- Earnings more than doubled leading to non-GAAP EPS growth of 90%;

- Raising full-year non-GAAP EPS guidance to $2.45 to $2.51.

. . . Diamond Foods, Inc today reported record sales growth and a more than doubling of earnings in its second quarter of fiscal 2011. The company is increasing full-year non-GAAP earnings per share (EPS) guidance by $0.02 to a range of $2.45 to $2.51 . . . .

For the three months ended January 31, 2011, diluted EPS grew 67 percent to $0.87 compared to $0.52 for the prior year's comparable period. Excluding $0.9 million in integration costs related to the Kettle acquisition last March, non-GAAP EPS was up 90 percent to $0.91 compared to $0.48 for the prior year's quarter.

\*       \*       \*

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    - 21 -

**Financial Highlights**

Net sales during the quarter were $257.6 million, 40 percent above the prior year, and retail sales were $215.6 million, up 63 percent, driven by significant snack revenue growth due to the addition of Kettle and strong organic snack sales. In-shell retail sales were up 15 percent driven by strong sell through during the holiday season.

\*        \*        \*

Selling, general and administrative expense (SG&A) was $24.0 million during the quarter, or 9.3 percent of net sales. Advertising expense was on plan at $10.0 million for the quarter. A greater portion of consumer support will be spent in the second half of the fiscal year.

The effective tax rate was 34.2 percent for the quarter.

EBITDA grew 81 percent to $83.4 million year to date.

As of January 31, 2011, net debt outstanding was $525.4 million, a reduction of $21.6 million from the first fiscal quarter.

**Financial Outlook**

For the third quarter of fiscal 2011, we expect non-GAAP EPS of between $0.45 and $0.50 and net sales of between $210 million to $220 million.

For the full year of fiscal 2011, we now expect net sales of between $925 million and $950 million compared to $920 million and $945 million previously, which implies growth of 36 percent to 40 percent above fiscal 2010. We are raising non-GAAP EPS guidance by $0.02 to a range of $2.45 to $2.51, which implies net income growth of between 53 percent and 57 percent over fiscal 2010 non-GAAP results.

61.     On March 8, 2011, the Individual Defendants (other than Mussell and Wolford) caused the Company to file its quarterly report on Form 10-Q with the SEC. The Form 10-Q was signed by defendant Neil, and reviewed and approved beforehand at least by Defendants Mendes, Blechschmidt, Silveira and Warren, and repeated and expanded upon the financial results in the March 8, 2011 press release. The Form 10-Q also discussed the manner in which the Company received and paid for walnuts used in its consumer snack products, including but not limited to, stating that the purchase price to be paid to walnut growers would be determined by Diamond in good faith.

**The Pringles Transaction Is Announced**

62.     On April 5, 2011, the Company announced that it had entered into a definitive agreement with P&G to merge P&G's Pringles business into Diamond. The transaction was valued

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 22 -

1    at $2.35 billion in cash and stock and would be accomplished through a "Reverse Morris Trust"

2    transaction.  The Agreement and Plan of Merger was approved by all the Individual Defendants

3    (except Mussell and Wolford).  The press release projected the Company's fiscal 2011 financial

4    results as if Pringles had been owned by the Company for the entire fiscal year and estimated fiscal

5    2012 results for the combined Company under the assumption the transaction would be

6    consummated.

7    **Diamond Foods to Merge P&G's Pringles Business into the Company**

8    *Accretive combination makes Diamond the number two global player in savory*
     *snack category*

9

10   . . . Diamond Foods, Inc. and The Procter & Gamble Company today
     announced the signing of a definitive agreement to merge the Pringles business
     ("Pringles") into Diamond Foods in a transaction valued at $2.35 billion.

11

12   "Pringles is an iconic, billion dollar snack brand with significant global
     manufacturing and supply chain infrastructure," said Michael J. Mendes, Chairman,
     President and CEO of Diamond Foods. "Our plan is to build upon the brand equity

13   Pringles has established in over 140 countries. This strategic combination will create
     an independent, global leader in the snack industry with a focus on quality and

14   innovative products. Not only is this combination immediately accretive, it also
     creates a platform that we believe will allow us to build shareholder value for years

15   to come."

16                                   *         *         *

17   The combination will more than triple the size of Diamond's snack business
     and:

18

19   • Increase scale in U.S. grocery, mass merchandise, drug and convenience
       channels to gain greater merchandising and distribution influence;

20   • Leverage Diamond's sales and distribution infrastructure through a more than
       doubling of snack sales in the U.S. and U.K., which are Pringles' two largest

21     markets;

22   • Gain a broader global manufacturing and supply chain platform, with access
       into key growth markets around the world, including Asia, Latin America

23     and Central Europe;

24   • Increase Diamond's geographic diversity, with international sales accounting
       for approximately 49 percent of total revenues on a pro forma basis.

25

26   Diamond Foods has a history of building, acquiring and energizing brands
     through product and package innovation, efficient distribution and brand investment.
     ***The Company's total revenues have doubled and earnings per share (EPS) have***

27   ***grown more than four-fold in the past five years.***

28                                   *         *         *

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                        - 23 -

**Financial Benefit for Diamond Foods Shareholders**

Assuming Pringles had been owned for all of fiscal year 2011, the combined company would be expected to deliver the following estimated financial results on a pro forma basis for fiscal year 2011:

- Net sales of approximately $2.4 billion;

- Double-digit accretion to earnings per share (EPS), excluding merger and integration costs;

- Estimated earnings before interest, taxes, depreciation and amortization (EBITDA), including $25 million in synergies, of approximately $398 million to $410 million.

For fiscal year 2012, Diamond anticipates strong growth in its core business with EPS of $2.85 to $2.98 per share on a standalone basis, an increase of 15 percent to 20 percent from the midpoint of its fiscal 2011 guidance range, which represents a 30 percent increase over 2010 EPS.

Combined results for Diamond plus the Pringles business for fiscal year 2012 will depend on the actual closing date of the transaction. Assuming the transaction closes by the end of calendar 2011, seven months of Pringles performance would be included in the following expected results:

- Fiscal 2012 total net sales are estimated to be approximately $1.8 billion;

- Fiscal 2012 EPS, before costs associated with the transaction and integration, are estimated to range from $3.00 to $3.10 per share, which reflects EPS accretion of 12 to 15 cents per share

The transaction is expected to significantly increase cash flow and accelerate the de-levering of Diamond's balance sheet. Pro forma leverage at closing is projected to be below four times EBITDA, and projected to drop below three times at the end of fiscal 2013. Cash flow after brand investments and capital expenditures is expected to approach $200 million in the first full fiscal year after closing the merger.

\* \* \*

**Transaction Details**

P&G expects the separation to occur through a "split-off" transaction in which P&G shareholders can elect to participate in an exchange offer to exchange P&G shares for shares of Diamond. Under the terms of a split-merge agreement, P&G will establish a separate entity to hold the Pringles business, which will be distributed to electing P&G shareholders in a tax-efficient transaction with a simultaneous merger with Diamond. This "Reverse Morris Trust" transaction has been approved by the boards of both companies. We expect to finalize the details of this transaction in the coming months.

1    The value of the transaction is $2.35 billion, comprising $1.5 billion in
Diamond common stock, consisting of 29.1 million shares for approximately 57
2    percent of the outstanding shares of the combined company, and the assumption of
$850 million of Pringles debt. Diamond's existing shareholders would continue to
3    own approximately 43 percent of the combined company.

4    The parties have also agreed to a collar mechanism that would adjust the
amount of debt assumed by Diamond based upon Diamond's stock price during a
5    trading period prior to the commencement of the Exchange Offer. The amount of
debt to be assumed by Diamond could increase by up to $200 million or decrease by
6    up to $150 million based on this adjustment mechanism.

7    Diamond expects to incur one-time costs of approximately $100 million
related to the transaction over the next two years. P&G also will provide Diamond
8    transition services for up to 12 months after closing.

9    **Leadership, Approvals and Timing**

10    The combined business will be managed by Diamond's executive team and
board of directors, led by Michael J. Mendes, Chairman, President and CEO. The
11    company's headquarters will remain in San Francisco, California.

12    The transaction is subject to approval by Diamond shareholders and the
satisfaction of customary closing conditions and regulatory approvals. The
13    transaction is expected to be completed by the end of calendar 2011.

14    (Footnotes omitted.)

15    63.    After the April 5, 2011 announcement of the Company's agreement with P&G to

16    acquire the Pringles business, Diamond's stock price increased more than 8% from a close of $57.22

17    per share on April 4, 2011 to a close of $62.39 per share on April 6, 2011, on heavy trading volume.

18    64.    At the time, the Individual Defendants (other than Mussell) caused the Company to

19    disseminate the following chart to illustrate, in simplified form, the effect the merger would have on

20    Diamond's existing corporate structure if the merger was approved:

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///





### Third Quarter Fiscal 2011 Reported Results

65.     On June 2, 2011, the Individual Defendants (except Mussell) caused Diamond to report its third quarter fiscal 2011 financial results.  The financial results were reviewed and approved by Defendants Mendes, Neil, Blechschmidt, Wolford and Silveira.  The Company reported

that sales and earnings increased 61% and 91%, respectively, and raised its guidance for fiscal 2011 non-GAAP EPS to $2.48-$2.52 per share from $2.45-2.51 per share.

**Diamond Foods Raises Guidance After Strong Third Quarter**

- Net sales increased 61%, non-GAAP earnings grew 91%;

- Snack sales up 72%, reflecting double-digit organic snack sales growth and the addition of Kettle;

- ***Raising full-year fiscal 2011 non-GAAP EPS guidance***.

. . . Diamond Foods, Inc. today reported strong financial results for its third quarter of fiscal 2011 and raised guidance for fiscal year 2011.

For the three months ended April 30, 2011 non-GAAP diluted earnings per share (EPS) was $0.52 and non-GAAP net income was $11.8 million, 91 percent above the prior year's comparable net income. On a GAAP basis, EPS was $0.34 compared to $(0.22) for the prior year's comparable period. This year's GAAP EPS included costs associated with the announced merger with Pringles and integration costs associated with the Kettle acquisition, while last year's GAAP EPS included costs associated with the Kettle acquisition.

"Our business performed well during the quarter, including double digit organic growth in our snack portfolio," said Michael J. Mendes, Chairman, President and CEO. "Based on our strong overall performance and effective integration of Kettle, we have increased our financial guidance for the year. We're off to a strong start in planning for the integration of Pringles, and are encouraged by the prospects for the new combined entity."

**Corporate Highlights**

\*      \*      \*

- On April 5, 2011, Diamond announced the merger of P&G's Pringles business into Diamond in a Reverse Morris Trust transaction with an expected close by the end this calendar year.

- Adjusted EBITDA grew 139 percent to $32.4 million.

- A quarterly dividend of $0.045 per share was paid on May 3, 2011 to shareholders of record as of April 22, 2011.

\*      \*      \*

**Financial Results**

Net sales during the quarter grew 61 percent to $223 million, driven by significant growth in snack revenue and international non-retail sales. Snack revenue growth of 72 percent is attributed to two additional months of Kettle in the results this year and double digit organic growth across the snack portfolio. Non-retail sales for the quarter grew as a result of increased supply that was primarily shipped to international markets. Fiscal year-to-date net sales grew 46 percent to $733.1 million.

For the quarter, gross profit as a percentage of net sales was 26.7 percent compared to the prior year quarter's 22.4 percent, primarily as a result of sales mix and productivity improvements. For the first nine months of the fiscal year, gross profit as a percentage of net sales was 26.5 percent, 320 basis points above the prior year comparable period's 23.3 percent. . . .

Selling, general and administrative expense (SG&A) was $24.2 million during the quarter, and SG&A as a percentage of net sales was 10.8 percent. Fiscal year-to-date SG&A was $71.3 million, or 9.7 percent of net sales.

Advertising expense was $11.9 million during the quarter, up 57% over the prior year comparable period, driven by multi-media support for the successful Breakfast on the go! launch in grocery retailers. Advertising expense for fiscal year-to-date was $34.4 million, 32 percent above the prior year's level of $26 million.

Adjusted EBITDA grew 94 percent to $115.8 million year to date.

As of April 30, 2011, net debt outstanding was $549.4 million and net leverage ratio was 3.9.

### Financial Outlook

For the fourth quarter of fiscal 2011, we expect non-GAAP EPS of between $0.40 to $0.44 and net sales of between $210 million to $220 million.

This fourth quarter guidance implies that for the full fiscal year, we now expect net sales of between $943 million to $953 million compared to $925 million to $950 million previously and non-GAAP EPS of $2.48 to $2.52 compared to $2.45 to $2.51 previously. ***This increased EPS guidance represents growth in net income of 52 percent to 55 percent over full fiscal 2010 results. This full year guidance reflects***:

- Snack sales of $545 million to $560 million;

- Gross margin growth of 200 to 300 basis points over 2010;

- Advertising investment of $43 million to $44 million;

- Operating income as a percent of net sales of 11 percent to 12 percent, excluding acquisition and integration costs;

- Adjusted EBITDA of $142 million to $145 million;

- An effective tax rate of 33 percent.

For fiscal 2012, guidance is unchanged since it was first provided on April 5, 2011. For Diamond on a standalone basis, we anticipate non-GAAP EPS of $2.85 to $2.98, an increase of 14 percent to 19 percent over the midpoint of the updated guidance range for 2011. Combined EPS results for Diamond plus Pringles, assuming the transaction closes by the end of this calendar year, are expected to be $3.00 to $3.10 per share, excluding costs associated with the transaction and integration.

(Footnotes omitted.)

**Pringles Transaction Receives Regulatory Approval**

66.     On June 21, 2011, the Company announced that the Hart-Scott Rodino Act waiting period had expired, thus removing one hurdle to the execution of the Pringles acquisition:

> **Diamond Foods Announces Expiration of Hart-Scott-Rodino Act Waiting Period for Acquisition of Pringles**
>
> . . . Diamond Foods, Inc. today announced that the waiting period for U.S. antitrust review under the Hart-Scott Rodino Antitrust Improvements Act of 1976 for Diamond Foods' pending acquisition of the Pringles business from The Procter & Gamble Company expired on June 20, 2011. The pending acquisition remains subject to regulatory approval by competition authorities in various jurisdictions outside the United States.
>
> On April 5, 2011, Diamond Foods announced the signing of a definitive agreement to acquire the Pringles business from The Procter & Gamble Company in a Reverse Morris Trust transaction valued at $2.35 billion. The transaction, expected to close by the end of this calendar year, is also subject to satisfaction of other conditions including approval by Diamond's stockholders.

**Fiscal Year 2011 Reported Results and the 2011 Form 10-K**

67.     On September 15, 2011, the Individual Defendants (except Mussell) caused the Company to issue a press release announcing its fourth quarter 2011 and fiscal year 2011 financial results:

> **Diamond Reports Record 2011 Results and Raises Guidance for Fiscal 2012**
>
> - Snack sales grew 16 percent in the fourth quarter and 72 percent for the fiscal year;
>
> - Non-GAAP Earnings Per Share (EPS) increased 37 percent for the fiscal year;
>
> - Raising sales and EPS guidance for fiscal 2012.
>
> . . . Diamond Foods, Inc. today reported record financial results for its fiscal 2011 fourth quarter and full year.
>
> For the three months ended July 31, 2011, the first full comparable quarter since the acquisition of Kettle Foods, non-GAAP net income grew 58 percent to $11.9 million and non-GAAP fully diluted earnings per share (EPS) grew 53 percent over the prior year's quarter to $0.52. During the quarter, the Company incurred $9.4 million in acquisition and integration costs related to the purchase of Kettle Foods in 2010 and the pending acquisition of Pringles. Including these charges, ***GAAP net income grew 27 percent to $8.5 million and GAAP fully diluted EPS was $0.37, up 23 percent***.
>
> For the twelve months ended July 31, 2011, non-GAAP net income grew 61 percent over the prior year period to $59.0 million and non-GAAP EPS grew 37 percent to $2.61. Including $16.8 million in acquisition and integration costs related to the purchase of Kettle Foods in 2010 and the pending acquisition of Pringles,

*GAAP earnings grew 92 percent to $50.2 million, and GAAP EPS grew 63 percent to $2.22.*

"*Our base Diamond business delivered record financial results this quarter, with our snack portfolio up a solid 16 percent on an organic basis,*" said Michael J. Mendes, Chairman, President and CEO. "We're particularly pleased that we could achieve such strong performance while effectively managing the Pringles integration."

### Corporate Highlights

\*      \*      \*

• Full year adjusted EBITDA grew 72 percent to $146 million.

• . On August 3, 2011, the Company received the last of its antitrust clearances required for its pending merger of the Pringles business into Diamond in a Reverse Morris Trust transaction. The transaction is expected to close in December of this year.

• . Significant progress on Pringles integration activities including go-to-market planning, preparing to onboard employees at close, day one readiness and transition services planning.

• A quarterly dividend of $0.045 per share was paid on August 8, 2011 to shareholders of record as of August 1, 2011.

### Financial Results

Net sales during the quarter grew 32 percent to $232.8 million as a result of the strong performance of the snack portfolio and an increase in non-retail sales. Total retail net sales grew 14 percent to $191.0 million, and snack sales grew 16 percent to $145.7 million in the quarter. Non-retail sales totaled $41.8 million for the quarter compared to $41.3 million in the third quarter and $8.7 million in the fourth quarter a year ago. Full fiscal year net sales grew 42 percent to $965.9 million, with retail net sales up 43 percent to $816.1 million. Snack sales grew 72 percent for the full year and reached $553.2 million.

Gross profit as a percentage of net sales was 24.5 percent for the quarter and 26 percent for the year. The lower gross margin in the quarter reflects the relatively large percentage of non-retail sales in the quarter.

Selling, general and administrative expense (SG&A) was $25.7 million during the quarter. For the full fiscal year SG&A was $97.0 million, or 10 percent of net sales.

Advertising expense was $10.1 million during the fourth quarter, up 45 percent over last year's comparable period. For the full fiscal year, advertising expense was $44.4 million or 5.4 percent of retail net sales, an increase of $11.5 million over last year.

The effective tax rate on a non-GAAP basis was 23.6 percent for the quarter and 31.3 percent for the year, reflecting favorable income mix within our tax jurisdictions. On a GAAP basis, the effective tax rate was (38.4) percent for the

quarter and 27.4 percent for the year. The tax benefit in the quarter reflects a discrete benefit associated with the 2 percent U.K. rate reduction announced in July.

Capital expenditures for the year were $28 million. The Kettle capacity expansion in Salem was completed in April and the U.K. and Beloit, Wisconsin Kettle expansions are on schedule for completion in the fall of 2011 and spring of 2012, respectively.

As of July 31, 2011, net debt was $512.8 million, a decrease of $37 million from the prior quarter.

**Financial Outlook**

\*       \*       \*

For the full year of fiscal 2012, we expect non-GAAP EPS to range from $3.05 to $3.15, assuming the Pringles transaction closes in the first half of December. This EPS guidance is increased from $3.00 to $3.10 previously and reflects:

- Net sales of between $1.85 billion and $1.95 billion;

- An estimated operating margin of between 11.5 percent and 12.0 percent;

- Interest expense of between $40 million to $45 million;

- An effective tax rate of 27 percent to 30 percent;

- Outstanding share count of 42 million to 43 million;

- Capital expenditures of $75 million to $85 million;

- EBITDA of $300 million to $310 million;

- Transaction and integration costs of $150 million associated with the Pringles transaction over the next two years.

(Footnotes omitted.)

68.     On September 15, 2011, the Individual Defendants (except Mussell) caused the Company to file its Form 10-K for the period ending July 31, 2011 with the SEC (the "2011 Form 10-K"). The 2011 Form 10-K substantially repeated the Company's financial results for fiscal year 2011 as reported in the September 15, 2011 press release, and stated that the Company's financial statements were purportedly in compliance with GAAP. The Form 10-K was signed by Individual Defendants Mendes, Neil, Blechschmidt, Zollars, Wolford, Gilbert, Lea, Warren, Silveira, and Baer.

69.     The September 15, 2011 press release and the 2011 Form 10-K were materially false and misleading because $60 million worth of crop payments made to walnut growers in September

1   2011 were, as the Company has now admitted, accounted for improperly.  The payments should

2   have been recognized as expenses in fiscal year 2011.

3         70.      Defendant Deloitte & Touche signed Diamond's 2011 Form 10-K, in which it gave

4   Diamond an unqualified audit opinion and stated that Diamond's financial results complied with

5   GAAP in all respects and that the Company maintained effective internal control over financial

6   reporting as of July 31, 2011.  The 2011 Form 10-K included the following signed statement from

7   Deloitte & Touche:

8   **REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

9   To the Board of Directors and Stockholders of
    Diamond Foods, Inc.
10  San Francisco, California

11  We have audited the accompanying consolidated balance sheets of Diamond Foods,
    Inc. and subsidiaries (the "Company") as of July 31, 2011 and 2010, and the related
12  consolidated statements of operations, stockholders' equity, and cash flows for each
    of the three years in the period ended July 31, 2011. We also have audited the
13  Company's internal control over financial reporting as of July 31, 2011, based on
    criteria established in Internal Control — Integrated Framework issued by the
14  Committee of Sponsoring Organizations of the Treadway Commission. The
    Company's management is responsible for these financial statements, for
15  maintaining effective internal control over financial reporting, and for its assessment
    of the effectiveness of internal control over financial reporting, included in the
16  accompanying "Management's Report on Internal Control over Financial
    Reporting." Our responsibility is to express an opinion on these financial statements
17  and an opinion on the Company's internal control over financial reporting based on
    our audits.
18
    We conducted our audits in accordance with the standards of the Public Company
19  Accounting Oversight Board (United States). Those standards require that we plan
    and perform the audit to obtain reasonable assurance about whether the financial
20  statements are free of material misstatement and whether effective internal control
    over financial reporting was maintained in all material respects. Our audits of the
21  financial statements included examining, on a test basis, evidence supporting the
    amounts and disclosures in the financial statements, assessing the accounting
22  principles used and significant estimates made by management, and evaluating the
    overall financial statement presentation. Our audit of internal control over financial
23  reporting included obtaining an understanding of internal control over financial
    reporting, assessing the risk that a material weakness exists, and testing and
24  evaluating the design and operating effectiveness of internal control based on the
    assessed risk. Our audits also included performing such other procedures as we
25  considered necessary in the circumstances. We believe that our audits provide a
    reasonable basis for our opinions.
26
    A company's internal control over financial reporting is a process designed by, or
27  under the supervision of, the company's principal executive and principal financial
    officers, or persons performing similar functions, and effected by the company's
28  board of directors, management, and other personnel to provide reasonable assurance

regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

\*\*\*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Diamond Foods, Inc. and subsidiaries as of July 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended July 31, 2011, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of July 31, 2011, based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

/s/ Deloitte & Touche LLP
San Francisco, California
September 15, 2011

71.     Deloitte & Touche's certification was materially false and misleading because Diamond's 2011 Form 10-K did not comply with GAAP and the Company did not maintain effective internal control over financial reporting. The 2011 Form 10-K for the period ending July 31, 2011 failed to properly recognize $60 million worth of crop payments made to walnut growers in September 2011 that should have been recognized as expenses in fiscal year 2011, but which instead were improperly deferred until fiscal year 2012 and falsely characterized as "momentum payments" to farmers as an alleged advance for future crop deliveries.

**The 2011 Proxy Statement**

72.     On September 26, 2011, the Individual Defendants (except Mussell) caused Diamond to issue a definitive Proxy Statement which solicited Diamond shareholders to vote in favor of the merger with P&G's Pringles division (the "2011 Proxy Statement"). The 2011 Proxy Statement was

prepared and approved by Individual Defendants Mendes, Neil, Blechschmidt, Zollars, Wolford, Gilbert, Lea, Warren, Silveira, and Baer.

73.    The 2011 Proxy Statement represented the following to be true and correct information about Diamond's financial results:

**Summary Historical Consolidated Financial Data of Diamond:**

|  | Fiscal Year Ended July 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
|  | (Dollars in millions, except per share data) | | |
| **Consolidated Statement of Income Data:** | | | |
| Net sales | $ 965.9 | $ 680.2 | $ 570.9 |
| Cost of sales | 714.8 | 519.2 | 435.3 |
| Gross profit | 251.1 | 161.0 | 135.6 |
| Operating expenses: | | | |
| Selling, general and administrative | 97.0 | 64.3 | 61.0 |
| Advertising | 44.4 | 33.0 | 28.8 |
| Acquisition and integration related expenses | 16.8 | 11.5 | — |
| Total operating expenses | 158.2 | 108.8 | 89.8 |
| Income from operations | 92.9 | 52.2 | 45.8 |
| Interest expense, net | 23.8 | 10.2 | 6.3 |
| Other expenses, net | — | 1.8 | 0.9 |
| Income before income taxes | 69.1 | 40.2 | 38.6 |
| Income taxes | 18.9 | 14.0 | 14.9 |
| Net income | $ 50.2 | $ 26.2 | $ 23.7 |
| Earnings per share: | | | |
| Basic | $ 2.28 | $ 1.40 | $ 1.45 |

| | | | | | |
|---|---|---|---|---|---|
| Diluted | $ | 2.22 | $ | 1.36 | $ | 1.42 |

The summary historical consolidated financial data presented below have been derived from, and should be read together with,

| | As of July 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Consolidated Balance Sheet Data: | | |
| Total assets | $  1,288.4 | $  1,225.9 |
| Long-term debt, including current portion | 531.7 | 556.1 |
| Total stockholders' equity | $  454.8 | $  379.9 |

Diamond's consolidated financial statements and the accompanying notes and the related "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections included in Diamond's Annual Report on Form 10-K for the fiscal year ended July 31, 2011, which is incorporated by reference into this proxy statement. The summary historical consolidated financial data as of July 31, 2011 and 2010 and for the fiscal years ended July 31, 2011, 2010 and 2009 have been derived from audited financial statements incorporated by reference in this prospectus. The data shown below is not necessarily indicative of results to be expected for any future period. To find out where you can obtain copies of Diamond's documents that have been incorporated by reference, see "Where You Can Find More Information; Incorporation by Reference."

Summary Unaudited Condensed Combined Pro Forma Financial Data

This summary unaudited condensed combined pro forma financial data presented below have been prepared by Diamond and are being provided for illustrative purposes only and are not necessarily indicative of what the operating results or financial position of Diamond or Pringles would have been had the Transactions been completed at the beginning of the periods or on the dates indicated, nor are they necessarily indicative of any future operating results or financial position. Diamond and Pringles may have performed differently had they actually been combined during the periods presented.

| | For the Fiscal Year Ended July 31, 2011 for Pro Forma Combined Diamond and Pringles |
|---|---|
| | (Dollars in millions, except per share data) |
| Statement of Income Data: | |
| Net sales | $                          2,421.6 |
| Gross profit | 782.8 |
| Net income | 147.5 |

| | | | |
|---|---|---|---|
| Other Data: | | | |
| Net income per share of common stock, basic | $ | | 2.89 |
| Net income per share of common stock, diluted | $ | | 2.85 |
| Weighted-average shares of common stock outstanding, basic | | | 50.7 |
| Weighted-average shares of common stock outstanding, diluted | | | 51.3 |
| | | | |
| Financial Position (at period end): | | | |
| Cash and cash equivalents | $ | | 6.8 |
| Total assets | | | 4,913.7 |
| Long-term debt | | | 1,194.7 |
| Other noncurrent liabilities | | | 679.4 |
| Total stockholders' equity | | | 2,512.0 |

Comparative Historical and Pro Forma Per Share Data

The following tables set forth historical and pro forma per share data for Diamond. The Diamond historical data have been derived from, and should be read together with, the audited consolidated financial statements of Diamond and the related notes thereto contained in Diamond's Annual Report on Form 10-K for the fiscal year ended July 31, 2011 and incorporated by reference into this proxy statement. The Diamond pro forma data have been derived from the unaudited condensed combined pro forma financial data of Diamond included elsewhere in this proxy statement. See "Where You Can Find More Information; Incorporation by Reference."

This summary of comparative historical and pro forma per share data is being provided for illustrative purposes only and is not necessarily indicative of the results that would have been achieved had the Transactions been completed during the period presented, nor are they necessarily indicative of any future results. Diamond and Pringles may have performed differently had the Transactions occurred prior to the period presented. You should not rely on the pro forma per share data presented as being indicative of the results that would have been achieved had Diamond and Pringles been combined during the period presented or of the future results of Diamond following the Transactions.

The following table presents certain historical and pro forma per share data for Diamond:

| | As of and for the Fiscal Year Ended July 31, 2011 | | | |
|---|---|---|---|---|
| | Historical | | Pro Forma | |
| Diamond: | | | | |
| Earnings Per Share Data: | | | | |
| Basic | $ | 2.28 | $ | 2.89 |
| Diluted | $ | 2.22 | $ | 2.85 |
| Shares of common stock used to compute earnings per share (in millions): | | | | |
| Basic | | 21.6 | | 50.7 |
| Diluted | | 22.2 | | 51.3 |
| Book value per share of common stock | $ | 21.08 | $ | 49.57 |
| Cash dividends declared per share of common stock | $ | 0.18 | $ | 0.18 |

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT