74.     These statements in the 2011 Proxy Statement concerning Diamond's revenues, expenses, and profits for fiscal years 2010 and 2011 were false and misleading because they omitted approximately $20 million and $60 million in payments that Diamond should have made to its walnut suppliers, and included as expenses, in fiscal years 2010 and 2011 respectively.  Diamond later made the payments in August 2010 and September 2011 (its Q1 2011 and Q1 2012 fiscal quarters, respectively) and attempted to justify the deferment by falsely claiming that the payments were "momentum" payments for fiscal years 2011 and 2012.  The deferment of these payments was highly material since Diamond only reported $50.2 million in net income for its 2011 fiscal year. Thus, had the Individual Defendants properly accounted for such payments, Diamond would have reported approximately $40 million less in net income for fiscal year 2011.

75.     The Proxy further disclosed the following:

*Raw Materials and Supplies*

Diamond obtains its raw materials from domestic and international sources. Diamond currently purchases a majority of its walnuts from growers located in California who have entered into long-term supply contracts with Diamond. Additional walnuts may be purchased from time to time from other California walnut processors. Diamond purchases its other nut requirements from domestic and international processors on the open market. For example, during fiscal 2011, all of the walnuts, peanuts and almonds Diamond obtained were grown in the United States, most of Diamond's supply of hazelnuts came from the United States and Diamond's supply of pecans were sourced from the United States and northern Mexico.

**Seasonality**

Diamond experiences seasonality in its business. Demand for Diamond's in-shell and culinary products is highest during the months of October, November and December. Diamond purchases walnuts and pecans between August and February, and processes them throughout the year until the following harvest. Diamond purchases potatoes throughout the year, and demand for potato chips is highest in the months of June, July and August in the United States and November and December in the United Kingdom. As a result of this seasonality, Diamond's personnel, working capital requirements and inventories peak during the last four months of the calendar year. Diamond experiences seasonality in capacity utilization at its Stockton, California and Fishers, Indiana facilities associated with the annual walnut harvest.

**The Truth About the Payments Begins To Be Revealed But Is Denied By Diamond**

76. On September 27, 2011, *The Wall Street Journal* published an article entitled "Hidden Flaw in P&G's Diamond Deal," which discussed a $50 million payment the Company made in September 2011 to walnut growers, purportedly to "'optimize cash flow for growers . . . in light of the delayed harvest.'" The article suggested that the payment, had it been made during the fiscal year which ended July 31, 2011, would have reduced the Company's fiscal 2011 operating income by $50 million, devouring a substantial portion of the Company's reported fiscal 2011 earnings.

77. Also on September 27, 2011, Jefferies published a report entitled "Much Ado about Nothing," which discussed the September *Wall Street Journal* article, stating that the stock price decline in response to the article was an overreaction:

**The Diamond Foods (DMND)**

> Much Ado About Nothing

> **Yesterday DMND declined 5.7% on reports that profits in 1Q are in jeopardy due to unusual one-time payments to walnut growers the company made in September. We believe that the stock overreacted. It is our understanding that DMND usually makes payments to growers in late August/early September, and even though the size of the payment might have been bigger this year we do not believe that it jeopardizes quarterly results. Regular payments to growers are a result of the walnut purchase agreement.**

>         \*     \*     \*

> DMND's contract with growers basically guarantees the purchase of the entire walnut crop of a contracted grower with the price being determined only after DMND has sold the walnuts. As a result, DMND estimates the approx. liability to growers and makes periodic payments towards this estimate. The liability to growers peaks in the first half of the fiscal year . . . as the harvest is delivered, and then declines as the walnuts are sold and growers are paid. It is our understanding that the September payment of estimated $50 million (source: Wall Street Journal) was such a periodic disbursement to growers – even though the reported amount is not anywhere near the actual payment according to mgmt.

**As the September payment was not unusual, we believe the stock overreacted**.

Instead of potentially wiping out more than half of the reported FY11 EBIT the payment appears to be the regular cost of doing business and is part of the expected 1Q12 COGS for DMND.

78.    On October 3, 2011, the Individual Defendants (except Mussell) caused the Company to issue a press release entitled "Media Statement – Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance."  The press release stated as follows:

**Media Statement – Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance**

. . . Diamond Foods, Inc. made a pre-harvest momentum payment to walnut growers in early September, prior to the delivery of the fall walnut crop to reflect the fiscal 2012 projected market environment. The payment is accounted for in fiscal 2012 cost of goods sold and is reflected in the guidance provided by the company on September 15, 2011.

Diamond reaffirms the guidance provided in its press release dated September 15, 2011, which reflects not only higher commodity costs expected in fiscal 2012, but also recent retail price increases taken for its products. Diamond believes it has an ample walnut supply for both the retail and value-added, non-retail business.

**Financial Outlook**

For the first half of fiscal 2012, for Diamond on a standalone basis, we expect total net sales of between $540 million to $560 million, an increase in advertising investment of 20-25% over the first half of 2011 and non-GAAP EPS ranging from $1.65 to $1.75. We expect the distribution of earnings between Q1 and Q2 to be similar to last year's first half.

For the full year of fiscal 2012, we expect non-GAAP EPS to range from $3.05 to $3.15, assuming the Pringles transaction closes in the first half of December and reflects:

- Net sales of between $1.85 billion and $1.95 billion;
- An estimated operating margin of between 11.5 percent and 12.0 percent;
- Interest expense of between $40 million to $45 million;
- An effective tax rate of 27 percent to 30 percent;
- Outstanding share count of 42 million to 43 million;
- Capital expenditures of $75 million to $85 million;
- EBITDA of $300 million to $310 million;

- Transaction and integration costs of $150 million associated with the Pringles transaction over the next two years.

79.     On October 4, 2011, after meeting with Company management, RBC Capital Markets published a report entitled "'He Said, She Said' –Highlights of Marketing with Management," discussing disclosures concerning "'momentum payments'" to walnut growers and conveying management's "adamant" claim that the momentum payments were not designed to pay the walnut growers for the prior year's crop and that investor concerns were indeed unfounded:

**Diamond Foods, Inc. (NASDAQ: DMND)**

"He Said, She Said"

     *  *  *

Highlights From Marketing With Management

     *  *  *

**We marketed with Diamond management yesterday and came away comfortable that the walnut controversy should subside in due course.** Unfortunately, this is largely a "he said, she said" debate since management does not provide clear disclosure of its walnut profitability or grower payments. However, unless management is not being truthful, which we don't think is the case, the bear case should not prevail.

**Management gave clear answers to the two most important questions related to the walnut issue.** First, management is adamant that the company did not structure or communicate the "momentum payment" made last month as a form of compensation for last year's crop. Second, management commented that substantially all of the gross margin expansion in FY-11 was driven by Kettle and Emerald, and that margins for the other businesses – walnuts included – were similar to the prior year. If true, this means that walnuts did not massively over-earn in FY-11.

80.     Despite the Company's claims, CW1 stated that the Company's accounting for, and explanation of, alleged "momentum payments" made in August 2010 and September 2011 were clearly false and represented a basic accounting fraud pursuant to which the Company's executives and directors intentionally deferred recognizing substantial expenses (payments to walnut growers for their crops) to the next fiscal year in order to artificially inflate the Company's reported profits and earnings per share. A former high-level Diamond employee ("CW1"), who worked at the Company in domestic sales for nearly 10 years and worked closely with Defendant Mendes, noted that the Company had never made "momentum payments" to growers. Instead, the growers were

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT          - 40 -

1   paid on a timetable where the growers would receive three payments – one payment in October, one

2   payment in January, and one payment in March. Further, CW1 noted Diamond would never pay

3   growers in advance. CW1 also noted that a "momentum payment," even if one were to be made,

4   would need the approval by the CEO, CFO, and most likely, the Board because of the amounts

5   involved and their materiality to Diamond's financial results. Thus, according to CW1, the decision

6   to defer $60 million in payments to growers had to be made by the Company's CEO and CFO after

7   consultation with the Company's Audit Committee and/or full Board.

8   **The Pringles Transaction Is Approved Pursuant to the False 2011 Proxy Statement**

9         81.     On October 27, 2011, the Company announced that Diamond shareholders had

10   approved a proposal to issue new Diamond shares in connection with the Company's acquisition of

11   P&G's Pringles business:

12          **Diamond Foods Shareholders Approve Issuance of Shares in Connection**
       **With Pringles Transaction**

13

14          . . . Diamond Foods, Inc. today announced that its shareholders approved a
proposal to issue Diamond Foods common shares in connection with the merger of

15   the Pringles business into Diamond. At the special meeting of shareholders held
today, Diamond shareholders also approved all other proposals recommended by the
Board of Directors.

16

17          Closing of the transaction remains subject to customary closing conditions
and completion of the exchange offer by The Procter & Gamble Company ("P&G").
Antitrust approvals required for the transaction have already been obtained.

18

19   **The Walnut Payments Are Investigated and the Pringles Transaction Delayed**

      82.     On November 1, 2011, the Company issued a press release stating that the Audit

20

21   Committee of the Board of Directors would perform an internal investigation into the accounting for

the payments to walnut growers and that the highly anticipated merger transaction with Pringles,

22   which had been scheduled to close before the end of the year, would be delayed until mid-2012:

23

24          **Diamond Foods Provides Update on Pringles Transaction**

25          . . . Diamond Foods, Inc. today announced that its previously announced
acquisition of the Pringles snack business from The Procter & Gamble Company

26   ("P&G") is now expected to close in the first half of calendar 2012. Diamond and
P&G had previously expected the closing to occur in December of 2011.

27          Diamond and P&G have revised the expected closing date of the acquisition
following the receipt by the Chairman of the Audit Committee of Diamond's Board

28   of Directors of an external communication regarding Diamond's accounting for

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT       - 41 -

1    certain crop payments to walnut growers. In response to the communication,
     Diamond's Audit Committee decided to perform an investigation of this matter.
2    Management is fully committed to supporting the Audit Committee in this process.

3            Closing of the Pringles transaction remains subject to customary closing
     conditions and completion of an exchange offer by P&G. Antitrust approvals
4    required for the transaction have already been obtained.

5    83.    On the November 1, 2011 disclosures, the Company's stock price plummeted 17% to

6    close at $52.79 per share on November 2, 2011, down from $64.12 per share on November 1, 2011,

7    on massive trading volume.

8    84.    Then, on November 5, 2011, *Barron's Online* published an article entitled "Getting to

9    the Nut of the Problem."   The article discussed in detail the Company's September 2011

10   "momentum payment" to walnut growers and suggested that the Company may have overstated its

11   fiscal 2011 financial results.  In addition, the article stated that Diamond's Head of Field Operations

12   recently admitted that the "momentum payment" was indeed payment for the fiscal 2011 walnut

13   crop as opposed to the fiscal 2012 walnut crop:

14       Getting to the Nut of the Problem

15           After nearly a century as a walnut growers' cooperative, Diamond Foods
         broke out of its shell with a 2005 initial public offering. The San Francisco company,
16       which also sells pine nuts, almonds and pecans, proceeded to gobble up snack brands
         that included Pop Secret popcorn and Kettle chips – and promoting them with cheeky
17       television ads, among them, an annual 30-second spot on the Super Bowl.

18           In April, Diamond took an even bigger bite, announcing plans to acquire the
         Pringles chips business from [Procter & Gamble] (PG) in exchange for Diamond
19       stock. Those shares had themselves become a premium brand. . . .

20           Then, The Wall Street Journal talked to some walnut growers and found
         serious issues with Diamond's accounting issues that had escaped the eagle-eyed
21       advisors on the Pringles deal: Bank of America Merrill Lynch, Morgan Stanley and
         the Blackstone Group. On Tuesday, Diamond delayed the Pringles closing while the
22       audit committee of its board of directors investigates how Diamond accounted for its
         walnut-crop payments. Diamond's shares closed late Friday at $46.40, below their
23       level when the Pringles plan was announced.

24           After Diamond's walnut accounting gets scrutiny, the stock could get crushed
         again.
25
             *Suspect accounting for walnut purchases could crack snack-food producer*
26       *Diamond Foods' deal to buy Pringles from Procter & Gamble.*

27                               *        *        *

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 42 -

Even after the selloff, Diamond shares look pricey. The acquisitive outfit has no tangible book value. It reported earnings for the fiscal year ended July 2011 of $2.61 a share (ignoring pesky noncash charges, like option expenses), so Diamond's multiple on those trailing earnings is a generous 18 times. And 2011 earnings were likely overstated, says Mark Roberts, whose Off Wall Street Consulting Group rang the first alarm about Diamond's nutty accounting on Sept. 25, when most of Wall Street was still cheering the company on. Had Diamond properly booked costs for fiscal 2011, Roberts estimates, it would've earned as little as $1.14 a share.

Diamond declined to talk about the walnut investigation, but a spokesman said that both Diamond and P&G remain committed to completing a Pringles deal next year, which would double the company's sales. Yet if questions arise about Diamond's "representations and warranties" as it offered its shares to P&G shareholders in exchange for the Pringles business, the deal could fall apart or at least become much more expensive for Diamond.

Diamond's co-op members got more than half the company's stock in the IPO and signed contracts to sell their entire crop to Diamond for a term of three, five or 10 years. Happily for the farmer shareholders and all others, the stock rose steadily from its IPO price of 17. At the same time, however, many growers became unhappy with their multiyear contracts with Diamond.

        *       *       *

Then, in early September, Diamond sent growers something it called "a momentum payment" of 30 to 40 cents a pound. The company said the payment was for the coming 2011 crop, but farmers believe it was really a way to bring Diamond's price for their 2010 crop closer to market rates. Transaction records examined by Off Wall Street's Roberts showed that, until 2009, Diamond had called its August check the "final payment" for the prior year's crop.

        *       *       *

This year, Diamond didn't use the word "final" on its August payment to a grower Roberts spoke with, telling the grower to expect a September "momentum payment." Believing himself underpaid, the farmer asked Diamond's head of field operations if the September payment was for the 2010 crop. According to Roberts, the Diamond executive said yes. Most puzzling, the September payments went to farmers who've ended their sales contracts with Diamond and won't be supplying it with their 2011 year crop. *Barron's* spoke with one of those growers.

Had the September payments been counted as part of Diamond's July 2011 fiscal year, Roberts thinks that the gross margin reported by the company would have shrunk to less than 20%, from about 25%"making the exchange of its shares for Pringles less appetizing for P&G shareholders.

85.    On November 7, 2011, following these detailed disclosures, Diamond's stock price continued to decline on substantial trading volume, falling to a close of $39.09 per share, a 15% decline from its Friday, November 4, 2011, close of $46.40 per share.

1   86.   CW1 noted that on November 8, 2011, the Company confiscated employees'
2 computers and gave them replacement computers. The employees believed that management was
3 attempting to cover-up the wrongdoing.

4   87.   On November 22, 2011, the Company disclosed that Silveira had died. However, the
5 Company did not disclose the fact that Silveira had reportedly committed suicide. A MSNBC
6 reporter subsequently investigated the situation and spoke with the local coroner in Stanislaus
7 County, California, who indicated that Silveira had died of a self-inflicted gunshot wound.

8   88.   News articles published after Silveira's death questioned whether Silveira's suicide
9 represented guilt for his involvement in publication of Diamond's false financial statements.
10 *Questions were raised as to why Silveira had been on Diamond's Audit Committee in the first*
11 *place, given his lack of a background in finance and potential conflicts of interest he faced due to*
12 *his involvement with walnut growers and cooperatives.* For example, a November 28, 2011
13 Seeking Alpha article stated: *"Nothing on his resume suggests he had any accounting experience*
14 *or education. His career skills look like he was a farm manager and deal maker."* The article also
15 stated: "Aside from not having the education and accounting experience to be on the audit
16 committee, perhaps even more troubling is the conflict of interest. As shown here, which was
17 updated on 11/15/11, Joseph P. Silveira was the President, Chairman, and Director of Farmland
18 Management Services, Inc. This is an agricultural services company that I assume mostly serviced
19 nut growers. Silveira was a part of the walnut grower's group in California and managed walnut
20 orchards."

21   89.   CW1 also noted that the Audit Committee members should not have been on the
22 Audit Committee because they did not have the necessary financial and accounting skills. Another
23 former high-level employee ("CW2"), corroborates CW1. CW2 was in charge of sales to two large
24 retail customers and worked closely with Defendant Mendes. CW2 noted that the Audit Committee
25 members lacked the necessary skill set to fulfill their duties. According to CW2, the Audit
26 Committee was comprised of individuals who ran farms and/or who had contacts in the business
27 community, but were not skilled in corporate accounting and did not have the ability or willingness
28 to challenge Mendes.

90.     A November 23, 2011 article in *Bloomberg* entitled "Diamond Pringles deal May Be Hurt By Drop on Director's Death," stated:

> "Diamond Foods Inc. (DMND)'s decline after a report that director Joseph Silveira committed suicide may further complicate its proposed deal to buy the Pringles snack brand from Procter & Gamble Co. (PG) Silveira, who died Nov. 15, had served on the audit committee and recused himself from its investigation of payments to walnut growers. Diamond said on Nov. 1 that the probe would delay the acquisition of Pringles in a deal valued at $2.35 billion. P&G shareholders have to exchange some shares for Diamond stock as part of the agreement, and that may now be a harder sell, said Louis Meyer, a special-situations analyst for Oscar Gruss & Son Inc. in New York. Diamond's decline also may force it to assume more debt to complete the takeover, Meyer said."

91.     On November 29, 2011, the New York Times published an article entitled "Diamond Foods Makes Odd Moves." The article stated:

> "Things aren't getting any better for the snack food maker Diamond Foods. A month ago, it delayed its $2.4 billion plan to buy Pringles from Procter & Gamble in order to look into accounting concerns. Now, the company is burying news about the inquiry and increasing payments to a couple of directors who are walnut growers. These and other inconsistencies don't seem to augur well for the investigation, or its deal with Procter & Gamble.
>
> When the Pringles acquisition was hot, Diamond shares soared to over $90. They now trade at less than a third of that. Bringing in extra auditing and legal help, as Diamond has done, should help its internal committee expedite matters. But rather than disclose the hires it made earlier this month, Diamond waited until Monday and shoehorned them into a release underneath news about market share gains.
>
> Diamond hasn't exactly been a model of clarity. On Nov. 17, it publicly released a condolence note it wrote for Joseph P. Silveira, a board and audit committee member who had died. ***Only after news reports said that Mr. Silveira had committed suicide did the company say he had previously been excluded from the investigation because of a conflict of interest.***
>
> Then there are Diamond's purchases of its staple goods: walnuts. Some growers complained the company was severely undercutting rivals on price. That led to questions about the timing and accounting treatment of payments.
>
> On another note, one Diamond director who is also a grower made more in just a few months of this fiscal year than he did in all of last, and another is already 80 percent of

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                      - 45 -

the way there. Each also earned over 40 percent more last year than the year before.
Diamond says the growers were delivering more and were paid commensurately for their
crops, but superficially the numbers don't seem consistent with what other growers say."

92.     On December 12, 2011, Individual Defendants Mendes and Neil caused Diamond to
file a press release and Form 8-K stating that the Company would be unable to timely file its
quarterly financial statements.  In the press release, the Company stated that: "Diamond expects to
receive a notice of deficiency from the Nasdaq Listing Qualifications Department, indicating that
Diamond is not in compliance with Nasdaq Listing Rule 5250(c)(1)."

93.     Diamond has stated that it will be unable to file its Q1 2012 financial results until
after completion of its internal investigation.

94.     On December 15, 2011, Diamond announced that it had received a formal order of
investigation from the SEC on December 14, 2011 relating to whether the Company violated
accounting rules in connection with payments made to walnut growers.  Most SEC investigations are
"informal."  Formal investigations are more serious and rare.

95.     In response to the revelation of the formal SEC investigation, the Company's stock
declined and Jefferies, which had previously called the situation "much ado about nothing," changed
its mind and downgraded its rating on the stock to hold from buy and cut its price target to $27 from
$46.

96.     Forbes also published an article on December 15, 2011 noting that "The stock has
been hit with staggering losses in recent months, as investigations into 'momentum payments' made
to some of the company's vendors has postponed an important acquisition of Pringles from Procter
& Gamble."

97.     On January 12, 2012, it was revealed that prosecutors in the white-collar division of
the United States Attorney's Office in San Francisco opened an inquiry into whether financial
practices at Diamond involved criminal fraud.  News of the inquiry sent shares of Diamond stock
down more than 10 percent to $29.53 per share in after-hours trading on January 12, 2012.

1 **The Company Announces Improper Accounting and Places Mendes and Neil On Leave**

2       98.     On February 8, 2012, the Company issued a press release and filed a Form 8-K with

3 the SEC informing shareholders that the walnut crop payments were not accounted for properly and

4 that Diamond's previously issued consolidated financial statements for the fiscal years ended July

5 31, 2011 and July 31, 2010 should no longer be relied upon. The press release stated in pertinent

6 part:

7              The Audit Committee of the Board of Directors ("Audit Committee") of
Diamond Foods, Inc. ("Diamond") has substantially completed its previously
8 announced investigation of Diamond's accounting for certain crop payments to
walnut growers. The investigation focused primarily on whether payments to
9 growers in September 2011 in the amount of approximately $60 million and
payments to growers in August 2010 of approximately $20 million were accounted
10 for in the correct periods.

11              ***On February 7, 2012, the Audit Committee concluded that such crop
payments were not accounted for in the correct periods and that Diamond's
12 previously issued consolidated financial statements for the fiscal years ended July
31, 2011 and July 31, 2010, the accompanying reports of Diamond's independent
13 registered public accounting firm, and the previously issued unaudited condensed
financial statements for the interim quarterly periods for the fiscal year ended July
14 31, 2011 and the quarter ended July 31, 2010, should no longer be relied upon.*** In
addition, the Audit Committee determined that ***Diamond has one or more material
15 weaknesses in its internal control over financial reporting.*** As a result of these
internal control deficiencies, ***Diamond's disclosure controls and procedures were
16 not effective as of the fiscal years ended July 31, 2011 and 2010.*** The Audit
Committee has discussed these matters with Diamond's independent registered
17 public accounting firm.

18              Although the Audit Committee has concluded that restatements of certain of
Diamond's previously issued financial statements will be required as described
19 above, additional information could be discovered as part of the ongoing
investigation or in connection with the preparation of the restated consolidated
20 financial statements that could result in Diamond identifying additional accounting
errors. Diamond is working diligently to address control deficiencies and to complete
21 the restatement of Diamond's financial statements, and to file all required periodic
reports with the Securities and Exchange Commission as soon as practicable.

22

23       99.     Notably, the Audit Committee's investigation failed to attribute blame to itself or any

24 senior executives of the Company. The Audit Committee's investigation also did not state whether

25 the improper accounting was the result of any wrongdoing, and did not authorize the Company to

26 pursue any claims against culpable parties. In short, the Audit Committee investigation was a thinly-

27

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT            - 47 -

1  guised attempt at a cover-up orchestrated by some of the individuals who share the greatest

2  responsibility – the Audit Committee.

3      100.    Also on February 8, 2012, the Company issued a press release and filed a Form 8-K

4  with the SEC announcing that Defendant Mendes and Defendant Neil were placed on administrative

5  leave from their executive officer positions.  The Form 8-K stated in relevant part:

> **On February 7, 2012, Michael J. Mendes and Steven M. Neil were placed on administrative leave from their positions as President and Chief Executive Officer of Diamond, and Executive Vice President, Chief Financial and Administrative Officer of Diamond, respectively.**
>
> On February 7, 2012, the Diamond Board of Directors ("Board") appointed director Richard G. Wolford to serve as Diamond's Acting President and Chief Executive Officer. Mr. Wolford, 66, has served as a director of Diamond since April 2011. Mr. Wolford began his career in 1967 in the food industry at Dole Foods, a producer and marketer of fresh and packaged fruit and vegetables, where he held a range of management positions, including President of Dole Packaged Foods from 1982 to 1987. In 1996, he worked with TPG Capital, a private equity partnership, to acquire Del Monte Foods, a manufacturer, distributor and marketer of premium quality, branded food and pet products. He was named Chief Executive Officer and a director of Del Monte Foods in 1997, President of Del Monte Foods in 1998, and was elected Chairman of Del Monte Foods in 2000. He held these positions until his retirement in March 2011. Since September 2011, Mr. Wolford has served on the board of directors of Schiff Nutrition International, Inc., a provider of vitamins, nutritional supplements and nutrition bars, and Advantage Sales and Marketing LLC, a sales and marketing agency. From March 2008 to August 2009, Mr. Wolford served on the Board of Directors of Pulte Homes, Inc. Mr. Wolford holds a B.A. from Harvard University. Mr. Wolford's compensation arrangements have not yet been determined.
>
> On February 8, 2012, the Board appointed Michael Murphy of Alix Partners, LLP as Diamond's Acting Chief Financial Officer. Mr. Murphy, age 53, has over twenty-five years of professional experience in providing financial consulting services. He has served as a Managing Director of Alix Partners, a global business consulting firm, since 2005. Mr. Murphy has served in interim officer roles, including Chief Financial Officer, Chief Operating Officer, Chief Administrative Officer, Chief Restructuring Officer and Treasurer. He has extensive experience in a broad range of industries including, consumer business, retail, media, high technology and real estate. Diamond will pay Alix Partners a monthly fee of $100,000 in connection with Mr. Murphy's service as Diamond's Acting Chief Financial Officer, and will pay Alix Partners additional fees based on hourly rates for other Alix Partners personnel.
>
> In addition, on February 7, 2012, the Board appointed director Robert J. Zollars to serve as Chairman of the Board. Mr. Zollars has served as the Board's Lead Independent Director since July 2011.

101.    On this news, Diamond's stock plummeted from $36.66 per share on February 8, 2012 to close at $23.13 per share on February 9, 2012, a 37% drop in just one day.

102.    On February 9, 2012, Reuters published an article noting that Diamond Foods was in danger of breaching its debt covenants. The article stated in pertinent part:

> (Reuters) - Diamond Foods Inc (DMND.O) is likely to breach its debt covenants and cancel its biggest-ever deal, analysts said, as its stock tumbled 37 percent a day after the company removed its two top executives and said it would restate results for the last two years.
>
> "Diamond's (earnings) restatements will cause debt covenant default and ultimately raise interest expense," Janney Capital Markets analyst Mitchell Pinheiro said in a note, adding that Diamond's proposed purchase of Pringles potato chips from Procter & Gamble Co (PG.N) was "finished."
>
> The company will most likely have to renegotiate the terms of its debt and pay a higher interest rate, KeyBanc Capital Markets analyst Akshay Jagdale said.
>
> The restatement of results would change the ratio of debt to earnings -- one of the terms of Diamond's debt agreements.
>
> Diamond -- which had debt of $531.7 million and just $3.1 million of cash as of July 31, 2011 -- did not have an immediate comment.
>
> On Wednesday, Diamond, maker of Pop Secret popcorn and Kettle chips, said its audit committee found the company had improperly accounted for payments to walnut growers. It said it would restate results for fiscal years 2010 and 2011.
>
> Diamond removed Chief Executive Michael Mendes and named a director, Rick Wolford, as acting CEO. It also replaced Chief Finance Officer Steven Neil with Michael Murphy of consulting firm Alix Partners.
>
> SunTrust Robinson Humphrey's William Chappell, who previously backed the company's accounting practices, cut his rating on the stock to "neutral" from "buy," admitting that he had been wrong.
>
> "This is the worst-case scenario, not only creating uncertainty around the financial statements and removing a senior management team that directed the solid growth of the past few years, but also likely rendering dead the pending Pringles deal," Chappell said in a note.
>
> The company's stock was down 37 percent at $23.31 Thursday afternoon. Earlier in the session the shares fell to $21.44, their lowest in almost three years. More than 26 million shares were traded -- nearly 13 times the stock's 10-day moving average.

**The Pringles Transaction Is Terminated**

103.    On February 15, 2012, the Company issued a press release and filed a Form 8-K with the SEC announcing that Diamond and P&G had mutually agreed to terminate Diamond's proposed acquisition of the Pringles business. The Form 8-K stated in relevant part:

On February 14, 2012, Diamond Foods, Inc. ("Diamond") entered into a Termination Agreement ("Termination Agreement") with The Procter & Gamble Company ("P&G"), pursuant to which the parties terminated the Transaction Agreement ("Transaction Agreement") among P&G, The Wimble Company ("Wimble"), a wholly-owned subsidiary of P&G, Diamond and Wimbledon Acquisition LLC ("Merger Sub"), a wholly-owned subsidiary of Diamond, dated as of April 5, 2011, the Separation Agreement ("Separation Agreement") among P&G, Wimble and Diamond, dated April 5, 2011, and each other agreement entered into pursuant to or in connection with the transactions contemplated by the Transaction Agreement and the Separation Agreement (together with the Transaction Agreement and the Separation Agreement, collectively, the "Agreements"). The Transaction Agreement provided for a business combination involving Diamond, Merger Sub, P&G and Wimble in which P&G would have contributed certain of its assets and liabilities to Wimble and Wimble would have merged with and into Merger Sub, with Merger Sub continuing as the surviving company. The Separation Agreement provided for P&G to transfer certain assets and liabilities to Wimble.

Pursuant to the terms of the Termination Agreement, the parties have agreed to a mutual, full, irrevocable and unconditional release of all actions, suits, proceedings, claims, damages, causes of action, liabilities, costs, fees, expenses or obligations pursuant to, in connection with or arising from the Termination Agreement, the Agreements or the transactions contemplated by the Agreements, or any breaches or alleged breaches in connection with such agreements or transactions.

Diamond's Audit Committee has substantially completed its investigation of Diamond's accounting for certain crop payments to walnut growers. On February 7, 2012, the Audit Committee concluded that such crop payments were not accounted for in the correct periods and that Diamond's previously issued consolidated financial statements for the fiscal years ended July 31, 2011 and 2010, the accompanying reports of Diamond's independent registered public accounting firm, and the previously issued unaudited condensed financial statements for the interim quarterly periods for the fiscal year ended July 31, 2011 and the quarter ended July 31, 2010, should no longer be relied upon.

104.   Thus, Defendants' wrongdoing and breaches of fiduciary duty caused the collapse of the $2.4 billion acquisition of Pringles, forced the Company to launch an internal investigation, subjected the Company to multiple securities class action lawsuits alleging fraud, subjected the Company to a criminal investigation, subjected the Company to a formal SEC investigation, caused stock analysts who follow the company to drastically reduce their target prices for the Company's stock, caused the loss of millions of dollars of market capitalization, tarnished the Company's reputation among investors, damaged relations with walnut growers and will force the Company to restate its financial statements for fiscal year 2010 and 2011.

///

///

///

**DAMAGES**

105.    The Individual Defendants' wrongful conduct was the direct and proximate cause of damages Diamond has suffered, and will suffer, in numerous ways.

106.    The Individual Defendants failed to disclose: (i) that the Company had improperly accounted for $20 million of payments to growers in fiscal year 2010 and $60 million of payments to growers in fiscal year 2011; and (ii) the Company's financial results and prospects were misrepresented.   The false and misleading financial statements have devastated Diamond's credibility.  Diamond is now the subject of a class action lawsuit, alleging violations of securities laws in connection with the improper financial reporting, false statements, and material omissions. The Company will face substantial costs, expenses, and a potential adverse verdict in connection with that lawsuit.  Further, the Company will undergo the substantial expense of restating its financial statements and likely violating its debt covenants.

107.    As a result of the false financial report, the agreement between Diamond and P&G by which Diamond was to acquire Pringles has been terminated.  Diamond has lost the substantial benefits that were to come from the Pringles transaction, which, among other things, was going to transform Diamond into the second largest snack food company, behind only PepsiCo.'s Frito-Lay unit. Diamond has suffered damages from the termination of the agreement, including the fees and expenses spent negotiating and arranging the agreement.   It also incurred substantial costs in connection with planning for the consummation of the Pringles transaction, including the integration of the companies, which reportedly had progressed significantly.

108.    The Company has also suffered damages as a result of the false 2010 Proxy Statement.  Because the $20 million payment to growers was not properly accounted for in fiscal year 2010, the Company's expenses were understated and its profits were materially inflated.  Had the $20 million payment been properly disclosed, the disclosures would have materially affected the shareholders' voting decisions with respect to the matters voted upon in the Proxy, including the re-election of Gilbert, Neil, Zollars, and Blechshmidt at the 2010 Annual Meeting of Stockholders and the shareholders' voting decision as to the appointment of Deloitte & Touche as the Company's independent public accounting firm.

109.    The Company has also suffered damages as a result of the false 2011 Proxy Statement.  Because the $60 million payment to growers was not properly accounted for in fiscal year 2011, the Company's expenses were understated and its profits were materially inflated.  Had the $60 million payment been properly disclosed, the disclosures would have materially affected the shareholders' voting decisions with respect to the matters voted upon in the 2011 Proxy Statement, including approval of the acquisition of Pringles.  Further, the Company would not have undergone the expense of preparing that Proxy Statement and negotiating the agreement with P&G because P&G would have terminated the acquisition, and the Company would not have incurred the other costs associated with trying to consummate the Pringles transaction and prepare for the integration of the companies.

110.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Diamond's market capitalization has been substantially damaged.

111.    Further, as a direct and proximate result of the Individual Defendants' conduct, Diamond has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending Diamond and certain officers in the class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred in connection with the criminal investigation;

(c)    costs incurred in connection with the SEC investigation;

(d)    costs incurred in connection with restating Diamond's financial statements for fiscal years 2010 and 2011;

(e)    costs incurred in connection with the violation of any debt covenants;

(f)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Diamond's artificially-inflated stock price and inflated growth prospects;

(g)    costs incurred in connection with the Company's relations with walnut suppliers;

1    (h)    costs incurred from the loss of the Company's customers' confidence in

2    Diamond's products; and

3    (i)    damages to the Company due to the false and misleading financial statements

4    that the Individual Defendants caused the Company to file.

5    112.    Moreover, these actions have irreparably damaged Diamond's corporate image and

6    goodwill. For at least the foreseeable future, Diamond will suffer from what is known as the "liar's

7    discount," a term applied to the stocks of companies who have been implicated in illegal behavior

8    and have misled the investing public, such that Diamond's ability to raise equity capital or debt on

9    favorable terms in the future is now impaired.

10                          **DUTIES OF DEFENDANT DELOITTE & TOUCHE**

11    113.    Defendant Deloitte & Touche owed a duty to Diamond to perform its auditing

12    procedures in accordance with professional auditing standards. Although a diligent application of

13    standard Generally Accepted Auditing Standards ("GAAS") procedures by Deloitte & Touche

14    auditors assigned to Diamond should have caused Deloitte & Touche to identify and act to stop the

15    false and misleading accounting activity alleged herein, Deloitte & Touche also knew or should have

16    known that Diamond exhibited specific characteristics recognized by GAAS of an audit client at

17    higher than normal risk of misreporting its financial statements.

18    114.    GAAS requires, among other things, that an auditor plan and perform the audit with a

19    healthy attitude of professional skepticism. This requires an auditor to conduct an objective analysis

20    of persuasive evidence to make a reasonable judgment whether a public company's financial

21    statements are accurate.

22    115.    GAAS also requires an auditor to assess whether an accounting system is effective.

23    Among other things, an effective accounting system records transactions on a timely basis in

24    sufficient detail to permit proper classification and quantification for financial reporting purposes.

25    As part of this process, the auditor must assess the effectiveness of the client's internal control

26    system for preventing or detecting a material misstatement in the financial reports. Cardinal

27    characteristics of adequate internal controls include, among other things, properly designed

28    procedures to record payments to third parties.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                          - 53 -

116.     Thus, Deloitte & Touche was obligated to perform professional audits and act with reasonable care and competence in the performance of its auditing and consulting services, which required Deloitte & Touche to ensure that Diamond was properly accounting for payments made to walnut growers.  Further, Deloitte & Touche was required to exercise professional skepticism, a standard that required its personnel to probe and question Diamond's management, and to recognize the need to diligently and carefully corroborate management representations and explanations concerning potentially material matters.  Deloitte & Touche either knowingly or recklessly or negligently failed to address risks associated with the fact that Diamond had improperly accounted for payments to walnut growers, and as a result, materially misstated its financial statements. Deloitte & Touche also knowingly or recklessly or negligently failed to consider the fact that Diamond had material weaknesses in internal controls over financial reporting.  Deloitte & Touche was obligated under professional auditing standards to acquire sufficient information to assess the nature and magnitude of these risks.

117.     Defendant Deloitte & Touche is being sued in its capacity as an auditor for failure to consider obvious risk factors, failure to exercise professional care and skepticism, failure to obtain sufficient competent evidential matter, and over-reliance on management representations.

118.     GAAS  requires that auditors exercise due professional care in performing an audit or review and in preparing the audit report. AU §230.01. Due professional care requires that the auditor exercise professional skepticism in performing audit and review procedures and gathering and analyzing audit evidence. AU §230.07 -.08. "In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU §230.09.  Exercise of professional skepticism requires auditors to demonstrate a questioning mind and to critically assess audit evidence.  AU §316.27.

119.     GAAS also requires that auditors obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an audit opinion. AU § 326.01. Evidence obtained from independent sources outside the company provides greater assurance of reliability than that secured solely within the company. AU §326.21a. Auditors

1 | may not substitute management's representations for the application of auditing procedures

2 | necessary to afford a reasonable basis for an audit opinion.  AU § 333.02.

3 |      120.    In auditing and reviewing Diamond's financial statements, Defendant Deloitte &

4 | Touche acted unreasonably in failing to exercise due professional care and skepticism, failing to

5 | obtain sufficient competent evidential matter, and substituting management's representations with

6 | competent evidential matter.

7 |      121.    Among other things, Defendant Deloitte & Touche's liability arises from the fact its

8 | personnel failed to appropriately consider and modify the nature, timing and extent of procedures

9 | performed based upon risk factors and internal control deficiencies, including management's ability

10 | to override internal controls. Deloitte & Touche reasonably should have known that Diamond's

11 | accounting was not in conformity with GAAP.  Deloitte & Touche also reasonably should have

12 | know that certain disclosures in Diamond's publicly-filed financial information was inconsistent

13 | with actual practices employed by Diamond and that these did not comply with GAAP disclosure

14 | requirements.

15 |      122.    Defendant Deloitte & Touche also ignored various red flags about Diamond's

16 | improper accounting.  For example, although Diamond did not and had not paid "momentum

17 | payments," Deloitte & Touche did not adequately question the August 2010 or the September 2011

18 | payments that were deemed "momentum payments."  Also, until the August 2010 payment, the last

19 | payment check that was sent to walnut growers was designated as the "final" payment for that year's

20 | crop.  No such designation appeared on the checks for either the 2010 walnut crop or the 2011

21 | walnut crop.  Finally, the purported momentum payments were paid even to those walnut growers

22 | who did not have agreements with Diamond to deliver their next year's walnut crop.

23 |      123.    Defendant Deloitte & Touche, however, concurred with Diamond's accounting, did

24 | not object to Diamond's disclosures, and issued audit reports stating that Deloitte & Touche had

25 | conducted its audits in accordance with GAAS and concluded that Diamond's financial statements

26 | fairly presented its financial results in conformity with GAAP.

27 |      124.    In reaching these conclusions, Deloitte & Touche unreasonably relied on

28 | uncorroborated representations by Diamond management and/or unreasonably determined that the

1  payments were immaterial to Diamond's financial statements. As a result, Deloitte & Touche did

2  not comply with GAAS by unreasonably failing to exercise due professional care and skepticism and

3  to obtain sufficient competent evidential matter. Instead Deloitte & Touche substituted management

4  representations for competent evidence and failed to take appropriate action to correct Diamond's

5  inconsistent and deficient public disclosures while issuing inaccurate audit reports. Therefore,

6  Deloitte & Touche deliberately acquiesced in or ratified the dishonest acts of, and receipt of

7  improperly accounted for crop payments to walnut growers.

8  ## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

9      125.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company

10  to redress injuries suffered by the Company as a direct result of the violations of the federal

11  securities laws, breaches of fiduciary duty, as well as the aiding and abetting thereof, and unjust

12  enrichment by the Individual Defendants. The Company is named as a nominal defendant solely in a

13  derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would

14  not otherwise have.

15      126.    Plaintiffs will adequately and fairly represent the interests of the Company in

16  enforcing and prosecuting its rights.

17      127.    Plaintiffs have continuously held stock in the Company during all times relevant to

18  the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of

19  the Company.

20      128.    The Board of the Company at the time this action was first initiated consisted of the

21  following nine individuals: defendants Baer, Blechschmidt, Gilbert, Lea, Wolford, Zollars, Neil,

22  Mendes and Warren.[1] Plaintiffs have not made any demand on the present Board of the Company to

23

24  [1] The Board composition remains unchanged as of the filing of the consolidated complaint.
25  Although Mendes and Neil are on administrative leave with respect to their officer positions, they
    have not been removed from the Board and are still Board members. Indeed, the Company's
26  website still lists Mendes and Neil as directors.

27  *See http://investor.diamondfoods.com/phoenix.zhtml?c=189398&p=irol-govBoard* (last visited
    3/1/12).

28

1    institute this action because such a demand would be a futile, wasteful and useless act.  Demand is

2    futile for a combination of the following reasons:

3    **Defendants Gilbert and Lea Are Interested Because They Received Some of the Walnut**

4    **Momentum Payments At Issue In This Litigation**

5         129.    Defendants Gilbert and Lea are interested, and not capable of exercising independent

6    judgment, because they are among the very walnut growers who received so-called momentum

7    payments in August 2010 and September 2011.  Diamond disclosed the following in its 2011 Proxy

8    Statement:

9

    *Grower Payments*

10      Diamond has paid members of the Diamond Board who are currently growers from whom Diamond
purchases walnuts, or an affiliate of such growers, for walnut products Diamond received from them in the ordinary

11   course of business.

12      The following table shows the payments received by the directors who sold walnuts to Diamond in fiscal
2010 and fiscal 2011:

13

14

| Name | Fiscal Year | Grower Payments |
|---|---|---|
| John J. Gilbert(1) | 2011 | $ 2,744,476 |
| | 2010 | $ 1,916,048 |
| Robert M. Lea | 2011 | $ 844,487 |
| | 2010 | $ 557,853 |

19      (1)      Represents amounts paid to Rio Oso Groves, Inc., of which Mr. Gilbert is an owner and
executive officer, and to Gilbert Orchards, a corporation of which Mr. Gilbert is an owner and executive

20   officer.

21

22         130.    Given the magnitude of the payments Gilbert and Lea received from Diamond for

23    their walnut crop, and the fact that the momentum payments and the characterization of the

24    payments are key issues in this litigation, Gilbert and Lea are directly interested.  Also, they could be

25    key witnesses in the litigation.  Since they had and continue to have contracts with Diamond to grow

26    walnuts and deliver them to Diamond, Gilbert and Lea have direct knowledge as to whether the

27    payments Diamond made in September 2011 were "momentum" payments for fiscal year 2012, as

28    Diamond claimed, or payments that should have been made in fiscal year 2011.  Since their

1   testimony could directly undercut Diamond's contention that the payments did not have to be made

2   in fiscal year 2011, and indeed give rise to their own liability as directors for signing Diamond's

3   2011 Form 10-K that was false and misleading, Gilbert and Lea stand on both sides of the issue and

4   are hopelessly conflicted. Indeed, the Company does not contend that either Gilbert or Lea are

5   independent in its SEC filings. Thus, any demand as to them is futile and not required.

6   **Defendant Mendes**

7   131.    Mendes was the Chairman and CEO of the Company until February 7, 2012. He was

8   placed on administrative leave on February 7, 2012 from his position as President and CEO of the

9   Company but presently remains a member of the Board. The principal professional occupation of

10  Mendes is his employment with the Company, pursuant to which he received and continues to

11  receive substantial monetary compensation and other benefits. In fact, the Company paid Mendes

12  more than $4.3 million in compensation in 2010 alone. Given his personal ties to the Company, as

13  well as his significant compensation, Mendes is not capable of fairly considering a demand that he

14  initiate this lawsuit against himself or his fellow directors.

15  132.    Further, as Chairman and CEO, Mendes was ultimately responsible for ensuring that

16  the Company maintains effective accounting controls and complies with state and federal laws and

17  regulations concerning the Company's financial results. As discussed above, Mendes breached these

18  duties and, thus, is not capable of fairly considering a litigation demand. Mendes is currently named

19  as a defendant in the class action alleging violation of the federal securities laws. He caused the

20  Company to issue financial statements that he certified, under the Sarbanes-Oxley Act of 2002

21  ("Sarbanes-Oxley"), to be true and accurate, but which now will have to be restated. A restatement

22  is an admission that the restated financial results were not true and accurate. Thus, Mendes directly

23  made the false financial statements which have subjected the Company to potential significant

24  liability. He therefore cannot be disinterested in any demand that the Company sue him for breach

25  of fiduciary duty.

26  133.    In addition, Mendes signed the Company's 2011 Form 10-K and the 2010 Form-K.

27  Thus, Mendes also faces a substantial threat of liability given that the Audit Committee's

28  investigation concluded that the Company's financial statements were unreliable.

134.     The Company admits that Mendes is not independent in its SEC filings.

**Defendant Neil**

135.     Neil was the Company's CFO until he was placed on administrative leave on February 7, 2012 from his positions as Executive Vice President, CFO and Chief Administrative Officer of the Company.  He remains a member of the Board presently.  As CFO, one of his main responsibilities is to ensure that the Company maintains effective accounting controls and procedures. Neil breached this duty as discussed above and, thus, is not capable of fairly considering a demand that he initiate this lawsuit against himself or his fellow directors. Neil is currently named as a defendant in the class action alleging violation of the federal securities laws.  He caused the Company to issue financial statements that he certified, under Sarbanes-Oxley, to be true and accurate, but which now will have to be restated.  A restatement is an admission that the restated financial results were not true and accurate.  Thus, Neil directly made the false financial statements which have subjected the Company to potential significant liability.   He therefore cannot be disinterested in any demand that the Company sue him for breach of fiduciary duty.

136.     Further, Neil signed the Company's 2011 Form 10-K and the Company's 2010 Form 10-K.   Thus, Neil also faces a substantial threat of liability given the Audit Committee's investigation concluded that the Company's financial statements were unreliable.

137.     In addition, Neil's principal professional occupation is his employment with the Company, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  In fact, in 2010 alone, the Company paid Neil more than $1.8 million in compensation. Given his significant compensation, Neil is incapable of fairly considering a litigation demand.

138.     The Company admits that Neil is not independent in its SEC filings.

**Defendants Blechschmidt, Zollars, Warren and Wolford**

139.     Defendants Blechschmidt, Zollars and Wolford are current members of the Company's Audit Committee, and Blechschmidt is the Chair of the Committee. Defendant Warren was a member of the Audit Committee during a portion of the Relevant Period, including during the

1  time the Pringles transaction was being considered by the Company. The Audit Committee was

2  tasked with investigating the wrongdoing alleged herein. As a result, Blechschmidt, Zollars and

3  Wolford cannot be expected to exercise independence or objectivity with respect to a decision to sue

4  themselves.

5      140.   The Audit Committee was investigating whether payments to walnut growers in

6  September 2011 in the amount of approximately $60 million and payments to growers in August

7  2010 of approximately $20 million were accounted for in the correct periods. On February 7, 2012,

8  the Audit Committee concluded that such walnut crop payments were not accounted for in the

9  correct periods and that Diamond's previously issued consolidated financial statements for the fiscal

10 years ended July 31, 2011 and July 31, 2010 should no longer be relied upon. In addition, the Audit

11 Committee determined that Diamond has one or more material weaknesses in its internal control

12 over financial reporting. The Audit Committee's investigation failed to attribute blame to itself or

13 any senior executives of the Company. The Audit Committee's investigation did not reveal how or

14 why these payments were not properly accounted for or whether the improper accounting was the

15 result of any wrongdoing. Thus, the Audit Committee cannot independently or disinterestedly

16 consider a demand to initiate this derivative litigation. Indeed, on the one hand, the Audit

17 Committee was responsible for the integrity of the Company's financial statements, yet, on the other

18 hand, the Audit Committee was made responsible to investigate the alleged misrepresentations in

19 those financial statements.

20     141.   Moreover, as detailed above, the Audit Committee's charter charges the Audit

21 Committee with reviewing the adequacy and effectiveness of the Company's accounting and internal

22 control policies and procedures. Thus, Blechschmidt, Zollars, and Wolford (and Warren when he

23 was a member of the Committee) were expressly responsible for ensuring that the Company did not

24 have any material weaknesses in its accounting controls. As members of the Audit Committee,

25 Blechschmidt and Wolford approved the financial results which are alleged to be false and

26 misleading and in violation of GAAP, and Zollars did not question those results. Having approved

27 the financial results at the heart of this lawsuit and their own internal investigation, Blechschmidt,

28 Zollars and Wolford cannot exercise independence with respect to their own liability and the

1   decision of whether to sue themselves and their fellow directors for wrongdoing centered on those

2   very same financial results.

3         142.    Blechschmidt, Zollars, Warren and Wolford were also responsible for ensuring that

4   all members of the Audit Committee were independent and qualified.  They failed in such duties

5   because, during the Relevant Period, at least Blechschmidt, Warren and Wolford allowed Silveira to

6   serve as a member of the Audit Committee despite knowledge that he was not independent and that

7   he did not have any sophistication in financial matters or reading financial statements.  CW1 also

8   noted that the Audit Committee members should not have been on the Audit Committee because

9   they did not have the necessary skills.  CW2 agreed that the Audit Committee lacked the necessary

10  skill set to fulfill their roles.  According to CW2, the Audit Committee was comprised of individuals

11  who ran farms but were not skilled in corporate accounting.  This violated the Audit Committee

12  Charter, which explicitly states that: "Each member of the Committee will meet the independence,

13  financial sophistication and experience requirements of the Securities Exchange Act of 1934, the

14  rules and regulations promulgated thereunder by the Securities and Exchange Commission

15  ("*Commission*") and The NASDAQ Stock Market, as they may be amended from time to time

16  ("*Rules*"), except as otherwise permitted by such Rules. Each member of the Committee will have

17  the ability to read and understand fundamental financial statements." Silveira was not independent

18  because he himself was a walnut grower and served in positions of power on cooperatives that

19  included walnut growers who sold walnuts to Diamond.

20        143.    Moreover, the payments ignored here were too egregious not to be questioned by a

21  properly functioning Audit Committee.  As stated above, various red flags existed which would have

22  alerted the Audit Committee that payments were being improperly recorded.  Although the payments

23  were deemed "momentum payments" they had not previously been made by Diamond, were made

24  prior to the time Diamond typically made its first payments to walnut growers, and the payments

25  were made to those growers who had not agreed to deliver their crops to Diamond.  Moreover, as

26  CW1 stated, the payments here were of such a size that Audit Committee and/or Board approval

27  would have been needed.

28

144.    Blechschmidt, Zollars, Warren and Wolford also signed the Company's 2011 Form 10-K. In addition, Blechschmidt, Warren and Zollars signed the Company's 2010 Form 10-K.

145.    Moreover, Blechschmidt, Zollars, Warren and Wolford face a sufficiently substantial likelihood of liability from their approval of the Company's false financial statements and violation of accounting rules that makes any litigation demand upon them futile.

**Defendant Baer**

146.    Demand is futile and therefore excused as to Defendants Baer because of his business dealings with Diamond that he would not want to jeopardize by agreeing to litigate against other directors.

147.    Defendant Baer is President of the San Francisco Giants (the "Giants"). He has held executive positions with the Giants since 1992. Diamond and the Giants have an ongoing business relationship. According to the 2011 Form 10-K, the Giants and Diamond "have a corporate sponsorship arrangement. In connection with the sponsorship, [Diamond] paid the [Giants] a fee and receive sampling, signage and other brand exposure benefits at AT&T Park during the baseball season."

148.    The Giants, which won the World Series in 2010, are a team that attracts millions of customers during the year at AT&T Park. Defendant Baer would not want to authorize litigation and potentially jeopardize the business relationship the Giants have with Diamond.

**All Individual Defendants**

149.    For the additional reasons set forth below, each of the current Board members is not capable of an independent, unconflicted determination as to whether to institute litigation against their fellow directors.

150.    Because of the number of Board members with connections to walnut growers, the importance of walnuts to Diamond's business, and the unusual payments paid to the walnut growers, the current Board knew or consciously disregarded that the accounting for the momentum payments was improper.

i.    From at least 2005 to the present, walnuts comprised at least 30% of Diamond's revenues. In addition, its agreements with growers provided,

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 62 -

among other things, that Diamond was to purchase the growers' entire walnut crop. Because payments for those crops were made by Diamond at several different times during the year, to account for costs properly, payments for any year's crops needed to be accounted for properly. Thus, Diamond typically made a final payment to growers in August for the walnut crop that was harvested during the fall of the prior year. Given how vital walnuts were to Diamond's business, it is reasonable to infer that the Individual Defendants knew the details of the payments for the walnut crops.

ii.    Moreover, several red flags existed that put, or unless they were extremely reckless would have put, the current Board on notice of the true nature of the payments made to the walnut growers. For example, Diamond paid walnut growers much less for their 2010 harvest than others in the industry. In addition, Diamond typically made a final payment for the fall harvest in August of the following year and marked such payment as being final for that harvest, however, it did not do so when it made its August 2011 payment to walnut growers. Also, Diamond did not make momentum payments for the coming year's crop in September. Finally, the payments that Diamond made in September 2011 included payments to walnut growers with whom Diamond did not have an agreement to buy their crop for the coming year. These facts made the current Board aware of, or they consciously disregarded, the improper nature of the accounting for these walnut payments, particularly at a time when it was to Diamond's benefit to have its stock price high in connection with the Pringles transaction.

151.    The actions taken by the current Board and the Audit Committee further reinforce that any demand on the Board would have been futile. While news reports stated that the Audit Committee would commence an investigation into the accounting for the walnut payments, it was later reported that it was P&G, not the current Board or Audit Committee, which insisted that the accounting for those payments be investigated. P&G was reported as stating that it wanted the

1   matter resolved before proceeding with the Pringles transaction and delayed the expected close until

2   the first half of 2012. Moreover, the Individual Defendants (except Mussell) strongly denied that the

3   payments were not properly accounted for when the initial articles appeared questioning those

4   payments.

5        152.    As for the Pringles transaction, part of the consideration Diamond was preparing to

6   pay for Pringles was comprised of Diamond stock. Any decrease in Diamond's stock price would

7   have made the acquisition less appealing and valuable to P&G. The 2011 Proxy Statement stated the

8   following with respect to negotiations the parties engaged in with respect to fluctuation in the price

9   of Diamond stock:

> On March 24, 2011, representatives of Diamond and P&G and their respective financial and legal advisors met in San Francisco to resolve remaining open issues, including the periods to be used to measure the price of Diamond common stock for purposes of setting the number of shares of Diamond common stock to be issued in the transaction and the break-up fee payable by Diamond to P&G in certain events. The parties also agreed to eliminate the structure that had previously been proposed by P&G involving the possible issuance of debt securities for the funding of a portion of the purchase price. In exchange, *the cash collar adjustment applicable if the price of Diamond common stock declined was increased to $200 million*, while maintaining the previously agreed upon adjustment if the price of Diamond common stock increased at $150 million. P&G and Diamond agreed to increase the cash portion of the price to $850 million, resulting in a dollar range of $700 million to $1.05 billion, for a total purchase price of $2.35 billion, inclusive of the $1.5 billion in Diamond common stock to be issued. The parties also agreed to a break-up fee amount of $60.0 million.

19       153.    Diamond was obligated under the merger agreement to assume $850 million in debt

20  from Pringles. However, the amount of debt that Diamond might have assumed could have risen by

21  as much as $200 million depending on Diamond's stock price. Thus, Individual Defendants had a

22  strong motive to maintain Diamond's stock price at inflated levels until the acquisition of Pringles

23  was completed. In order to attempt to keep the Company's stock inflated, the Individual Defendants

24  approved financial results which did not accurately reflect Diamond's results. All defendants who

25  signed the Company's 2010 Form 10-K and/or 2011 Form 10-K face a substantial likelihood of

26  liability for their conduct. Any demand on them to bring this suit is therefore excused as futile.

27

28

154.    Moreover, showing higher earnings and maintaining a high stock price had another benefit for the Individual Defendants.  Mendes and Neil received lucrative bonuses and other compensation based, in part, on the Company's earnings.  In addition, each non-employee director received 10,000 stock options for being a director.  The value of those stock options increased substantially as Diamond's stock price increased.  Indeed, the Individual Defendants were well compensated by Diamond.  According to the 2011 Form 10-K, each of the current non-employee directors were shown to have earned compensation in fiscal 2011 in excess of $300,000 for their memberships on the Diamond Board.

155.    Demand is also futile because Mendes exercised complete control over the Company and the Board, and the remaining Board members were not independent of Mendes.  Indeed, when the Company went public in 2005, CW2 who worked closely with Mendes and was substantially involved with the Wal-Mart account discussed possible director appointments with Mendes.  CW2 recommended that a Wal-Mart representative be appointed to Diamond's Board because Diamond transacted a substantial amount of its business with Wal-Mart.  According to CW2, Mendes quickly dismissed the idea because he needed a Board that he could control and that he did not want any independent people on the Board.  Because the Board is not independent of Mendes, any demand on them to bring this suit is excused as futile

156.    The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification.  Plaintiffs are not challenging the business judgment of the Board regarding the inclusion of improper accounting information in the 2011 Proxy Statement.  Because the standard for the Section 14(a) claim is that the Board was negligent in allowing the information to be included in that Proxy Statement, there is a substantial likelihood of personal liability of the Board members at the time this action was commenced.  As such, the Board would not be able to exercise their disinterest and impartial judgment in responding to a demand.

157.    Any suit by the current directors of the Company to remedy these wrongs would likely expose the Individual Defendants and the Company to violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they

1  are hopelessly conflicted in making any supposedly independent determination whether to sue
2  themselves.

3        158.    The Company has been and will continue to be exposed to significant losses due to
4  the wrongdoing complained of herein, yet the Individual Defendants and current Board have not
5  filed any lawsuits against themselves or others who were responsible for that wrongful conduct to
6  attempt to recover for the Company any part of the damages the Company suffered and will suffer
7  thereby.

8        159.    If the Company's current and past officers and directors are protected against
9  personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this
10  Complaint by directors' and officers' liability insurance, they caused the Company to purchase that
11  insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of the
12  Company.  However, due to certain changes in the language of directors' and officers' liability
13  insurance policies in the past few years, the directors' and officers' liability insurance policies
14  covering the defendants in this case contain provisions that eliminate coverage for any action
15  brought directly by The Company against these defendants, known as, *inter alia*, the "insured versus
16  insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of
17  the Company, there would be no directors' and officers' insurance protection and thus, this is a
18  further reason why they will not bring such a suit.  On the other hand, if the suit is brought
19  derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the
20  Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then
21  the current directors will not cause the Company to sue them, since they will face a large uninsured
22  liability.

23        160.    Moreover, despite the Individual Defendants having knowledge of the claims and
24  causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for the
25  Company for any of the wrongdoing alleged by Plaintiff herein.

26        161.    The current Board also demonstrated its lack of independence and objectivity by
27  failing to obtain independent counsel for months.  Although the initial derivative action was filed in
28  November 2011, at a time when (or shortly thereafter) the SEC and criminal investigations began, it

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                      - 66 -

1  was not until approximately three months later that members of the Diamond Board began to retain

2  counsel separate from the Company's counsel.

3       162.   A true and correct copy of the Complaint was delivered to the Company before its

4  filing with this Court.

5  **COUNT I**

6  **Derivative Claim Against The Individual Defendants for Violation of Section 14(a)**

7  **of the Exchange Act**

8       163.   Plaintiffs incorporate by reference and reallege each and every allegation contained

9  above, as though fully set forth herein.

10       164.   The Individual Defendants who were Diamond directors at the time, issued, caused to

11  be issued, and participated in the issuance of materially false and misleading written statements and

12  material omissions to shareholders that were contained in the Company's 2010 Proxy Statement.

13  The 2010 Proxy Statement soliciting materials failed to disclose to the Company's shareholders that

14  these Individual Defendants had caused the Company to file materially false and misleading

15  financial statements in the Company's 2010 Form 10-K. The 2010 Proxy Statement stated that the

16  Company's Annual Report filed on the 2010 Form 10-K was in compliance with GAAP and that the

17  Company maintained effective control over financial reporting. The 2010 Proxy Statement and the

18  2010 Form 10-K were materially false and misleading because they failed to disclose that Diamond

19  deferred approximately $20 million in payments to walnut growers which were due in the 2010

20  fiscal year until the first quarter of the 2011 fiscal year, thus decreasing expenses and increasing net

21  income in fiscal year 2010. Indeed, had the payments been made as they should have been in fiscal

22  year 2010, most of Diamond's profits would have been eliminated. By reasons of the conduct

23  alleged herein, the Individual Defendants, who caused the issuance of the 2010 Proxy Statement,

24  violated Section 14(a) of the Exchange Act. As a direct and proximate result of these Defendants'

25  wrongful conduct, the Company misled and/or deceived its shareholders by falsely portraying the

26  financial results and operations of the Company.

27       165.   The Individual Defendants who were Diamond directors at the time, issued, caused to

28  be issued, and participated in the issuance of materially false and misleading written statements and

1  material omissions to shareholders that were contained in the Company's 2011 Proxy Statement.

2  The 2011 Proxy Statement soliciting materials failed to disclose to the Company's shareholders that

3  these Individual Defendants had caused the Company to file materially false and misleading

4  financial statements in the Company's Form 10-K Annual Report for fiscal year 2011. The Proxy

5  Statement included such financial results and incorporated them by reference. The Proxy and the

6  10-K were false and misleading because they failed to disclose that Diamond deferred approximately

7  $60 million in payments to walnut growers which were due in the 2011 fiscal year until the first

8  quarter of the 2012 fiscal year, thus decreasing expenses and increasing net income in fiscal year

9  2011.  Indeed, had the payments been made as they should have been in fiscal year 2011, most of

10  Diamond's profits would have been eliminated.  By reasons of the conduct alleged herein, the

11  Individual Defendants, who caused the issuance of the 2011 Proxy Statement, violated Section 14(a)

12  of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, the

13  Company misled and/or deceived its shareholders by falsely portraying the financial results and

14  operations of the Company.

15         166.    Plaintiffs, on behalf of the Company, thereby seek relief for damages inflicted upon

16  the Company in connection with the misleading and incomplete proxy materials.  Diamond is

17  entitled to recover damages to compensate the Company for all damages resulting from the

18  Individual Defendants' acts and omissions in violation of Rule 14a-9.

19         167.    This action was timely commenced within five years of the date of the 2011

20  Proxy Statement and within two years from the time that plaintiffs discovered or reasonably could

21  have discovered the facts upon which this Complaint is based.

22                                          **COUNT II**

23  **Derivative Claim For Breach of Fiduciary Duty Against All Individual Defendants**

24         168.    Plaintiffs incorporate by reference each and every allegation set forth above.

25         169.    The Individual Defendants owed and owe the Company fiduciary obligations.  By

26  reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the

27  highest obligation of good faith, fair dealing, loyalty and due care.

28

1    170.    The Individual Defendants, and each of them, violated and breached their fiduciary

2    duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

3    171.    Each of the Individual Defendants had actual or constructive knowledge that they had

4    caused the Company to maintain ineffective internal controls.  These actions were not a good faith

5    exercise of prudent business judgment to protect and promote the Company's corporate interests.

6    They also failed to exercise due care to prevent Diamond from improperly accounting for payments

7    to walnut growers.  The Individual Defendants became aware, or should have become aware through

8    reasonable inquiry, of the facts alleged herein, but did nothing to correct them and thereby breached

9    their duty of care, loyalty, candor, accountability and disclosure to the stockholders of the Company

10    by failing to act as an ordinary prudent person would have acted in a like position.

11    172.    As a direct and proximate result of the Individual Defendants' failure to perform their

12    fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct

13    alleged herein, the Individual Defendants are liable to the Company.  Diamond has suffered at least

14    the following damages:  (i) its shareholders were deprived of accurate information concerning the

15    Company and its finances; (ii) the proposed transaction with Pringles was terminated; (iii) Diamond

16    is likely in violation of its debt covenants; (iv) Diamond's reputation and standing among walnut

17    growers, with whom it needs to continue to do business, is likely inexorably tainted; (v) Diamond

18    will incur substantial costs in connection with the restatements; and (vi) Diamond has been exposed

19    to tens of millions of dollars in potential liability from securities fraud class actions filed against the

20    Company and currently pending before this Court, and will incur substantial costs in connection with

21    investigations by the SEC and a criminal investigation.

22    173.    Additionally, by their actions alleged herein, the Individual Defendants, either

23    directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

24    duties with regard to prudently managing the assets and business of the Company in a manner

25    consistent with the operations of a publicly held corporation.  As a direct and proximate result of the

26    Individual Defendants' mismanagement and breaches of duty alleged herein, the Company has

27    sustained significant damages in excess of the jurisdiction of this Court.  As a result of the

28    misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the

1   Company. All the Individual Defendants, singly and in concert, engaged in the aforesaid conduct in

2   grossly negligent and/or reckless or knowing disregard of their fiduciary duties to the Company.

3

4         174.   Plaintiffs on behalf of the Company have no adequate remedy at law.

5                              **COUNT III**

6    **Derivative Claim Against Defendants Mendes and Neil for Unjust Enrichment**

7         175.   Plaintiffs incorporate by reference and reallege each and every allegation contained

8   above, as though fully set forth herein.

9         176.   During the Relevant Period, Defendants Mendes and Neil received incentive-based

10  compensation tied to the financial performance of Diamond. Because Diamond's financial results

11  were inflated during the Relevant Period as a result of the wrongdoing alleged herein, Defendants

12  Mendes and Neil received more compensation than they would have received had Diamond's results

13  not been inflated. Therefore, Defendants Mendes and Neil were unjustly enriched at the expense of

14  and to the detriment of the Company.

15         177.   During the Relevant Period, Defendants knew or should have known that the

16  Company's financial results and performance were artificially inflated due to Defendants'

17  wrongdoing.

18         178.   Plaintiffs, as shareholders and representatives of the Company, seek restitution from

19  these Defendants and seek an order of this Court disgorging all profits, benefits, and other

20  compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

21         179.   Plaintiffs, on behalf of the Company, has no adequate remedy at law.

22                              **COUNT IV**

23  **Derivative Claim for Contribution and Indemnification Against All Individual Defendants**

24         180.   Plaintiffs incorporate by reference and reallege each and every allegation contained

25  above as though fully set forth herein.

26         181.   This Claim is brought derivatively by plaintiffs on behalf of the Company against the

27  Individual Defendants for contribution and indemnification.

28

1   182.   Diamond is alleged to be liable to the putative class in the Pending Securities Fraud

2   Actions for misleading the public about the Company's operations and results. In the event the

3   Company is found liable to those persons for violating the federal securities laws, the Company's

4   liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of

5   some or all of the Individual Defendants as alleged herein, and the Company will be entitled to

6   receive contribution from those Individual Defendants in connection with the securities fraud actions

7   against the Company currently pending in this District. In the event the Company is found liable to

8   those persons for violating principles of state and/or common law, the Company's liability will result

9   in whole or in part from the intentional, knowing, reckless, or grossly negligent acts or omissions of

10  those Individual Defendants as alleged herein, and the Company will be entitled to receive

11  contribution or indemnification from those Defendants to the extent such claims are or will be

12  brought against the Company.

13                                   **COUNT V**

14      **Derivative Claim for Gross Mismanagement Against All Individual Defendants**

15   183.   Plaintiffs incorporate by reference and reallege each and every allegation contained

16  above as though fully set forth herein.

17   184.   This Claim is brought derivatively by plaintiffs on behalf of the Company against the

18  Individual Defendants for gross mismanagement.

19   185.   By reason of the foregoing, the Individual Defendants either directly or through

20  aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

21  to prudently managing the assets and business of Diamond in a manner consistent with the

22  operations of a publicly held corporation by improperly accounting for payments to walnut growers

23  and failing to maintain adequate financial controls.

24   186.   As a direct and proximate result of the Individual Defendants' gross mismanagement

25  and breaches of duty alleged herein, Diamond has sustained significant damages in excess of tens of

26  millions of dollars.

27   187.   As a result of the misconduct and breaches of duty alleged herein, the Individual

28  Defendants are liable to the Company.

188.   Plaintiffs on behalf of Diamond have no adequate remedy at law.

## COUNT VI

### Derivative Claim for Professional Negligence and Accounting Malpractice Against Defendant Deloitte & Touche

189.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

190.   Deloitte & Touche issued "clean" or unqualified opinions on Diamond's financial statements for fiscal years 2010 and 2011, stating that those financial statements were presented in accordance with GAAP based on Deloitte & Touche's audits which were performed in accordance with GAAS.  GAAS, as approved and adopted by the AICPA, governs the conduct of audit engagements.

191.   The objective of audits of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations and cash flows in conformity with GAAP.  The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states his audit has been in accordance with GAAS.  These standards required him to state whether, in his opinion, the financial statements are presented in accordance with GAAP and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.  AU § 110.01.

192.   GAAS as approved and adopted by the membership of the AICPA, are comprised of ten general standards.  These standards to a great extent are interrelated and interdependent.  The independent auditor is responsible for compliance with GAAS in an audit engagement.  The ten general standards are as follows:

   (a)   **General Standards**

      (i)   The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

1                  (ii)        In all matters relating to the assignment, independence in mental

2   attitude is to be maintained by the auditor or auditors.

3                  (iii)       Due professional care is to be exercised in the performance of the audit

4   and the preparation of the report.

5          **(b)**     **Standards of Fieldwork**

6                  (iv)       The work is to be adequately planned and assistants, if any, are to be

7   properly supervised.

8                  (v)        A sufficient understanding of the internal control structure is to be

9   obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

10                 (vi)       Sufficient competent evidential matter is to be obtained through

11  inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion

12  regarding the financial statements under audit.

13         **(c)**     **Standards of Reporting**

14                 (vii)       The report shall state whether the financial statements are presented in

15  accordance with GAAP.

16                 (viii)      The report shall identify those circumstances in which such principles

17  have not been consistently observed in the current period in relation to the preceding period.

18                 (ix)       Informative disclosures in the financial statements are to be regarded

19  as reasonably adequate unless otherwise stated in the report.

20                 (x)        The report shall either contain an expression of opinion regarding the

21  financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be

22  expressed.  When an overall opinion cannot be expressed, the reasons therefore should be stated.  In

23  all cases where an auditor's name is associated with financial statements, the report should contain a

24  clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the

25  auditor is taking.

26       193.    Deloitte & Touche's audits of Diamond's financial statements issued between 2010

27  and 2011 violated each of the general standards.

28

194.    Deloitte & Touche is one of the largest international firms of certified public accountants. Deloitte & Touche was the auditor of Diamond's financial statements between 2010 and the present. In addition, they were paid to review the quarterly financial statements of Diamond throughout this period. Deloitte & Touche audited Diamond's financial statements issued between 2010 and the present, and issued their audit opinions stating that those financial statements were fairly presented in accordance with GAAP, and that they had audited those financial statements in accordance with GAAS. Both of those statements were false. Deloitte & Touche either knew or should have been aware of facts that undeniably precluded them from making those statements at the time they were made. Diamond's financial statements and Deloitte & Touche's opinions on them were then used by Diamond with Deloitte & Touche's consent to publicly disseminate Diamond's financial results in the filing of their annual Forms 10-K with the SEC.

195.    Deloitte & Touche was negligent in failing to comply with GAAS as Diamond's independent accountant. Deloitte & Touche issued unqualified opinions stating that the financial statements of Diamond were fairly presented in accordance with GAAP, when they were aware of or should have been aware of facts and circumstances that undermined such unqualified opinions and rendered them false and misleading.

196.    In the course of performing their audit services, Deloitte & Touche reasonably could have obtained evidential matter revealing the adverse facts detailed above about Diamond's undisclosed so-called momentum payments to walnut growers, but improperly failed to require them to adjust their financial statements or make disclosure of such facts.    As a result of their investigations and audit work, Deloitte & Touche reasonably should have known that the reports and financial statements described herein were materially false and misleading or negligently disregarded facts that showed that all such statements were materially false and misleading.

197.    Because: (a) Deloitte & Touche spoke regularly with Diamond's Board and Audit Committee members who were knowledgeable about the undisclosed payments; and (b) Deloitte & Touche attended certain of Diamond's Board and Audit Committee meetings where legal compliance was discussed, Deloitte & Touche knew or negligently disregarded facts that indicated that they should have: (i) qualified their opinions on Diamond's financial statements for fiscal years

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 74 -

1   2010 and 2011; or (ii) required the Company to adjust its financial statements; or (iii) refused to give
2   opinions in light of the materially adverse effects of the undisclosed facts about Diamond's financial
3   condition.   The failure to make such qualification, correction, modification or withdrawal was a
4   violation GAAS.

5       198.   Deloitte & Touche failed to require Diamond to disclose material adverse facts and
6   allowed the Company to make material misrepresentations to their shareholders and to the investing
7   public.

8       199.   Defendant Deloitte & Touche violated GAAS General Standard No. 3, which requires
9   that due professional care must be exercised by the auditor in performance of the examination and
10   the preparation of the audit report.

11       200.   Defendant Deloitte & Touche violated GAAS Standard of Field Work No. 2, which
12   requires the auditor to make a proper study of existing internal controls, to determine whether
13   reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of
14   the auditing procedures to be applied.   Deloitte & Touche reasonably should have known that
15   Diamond's internal controls were insufficient yet still failed to expand their auditing procedures.

16       201.   Defendant Deloitte & Touche violated GAAS Standard of Field Work No. 3, which
17   requires sufficient competent evidential matter be obtained through inspection, observation, inquiries
18   and confirmations to afford a reasonable basis for an opinion to be issued on the subject financial
19   statements.   Deloitte & Touche failed to obtain sufficient competent evidential matter as to
20   Diamond's accounting and disclosure practices related to the purported momentum payments to
21   walnut growers.

22       202.   Defendant Deloitte & Touche violated GAAS Standard of Reporting No. 1, which
23   requires the audit report to state whether the financial statements are presented in accordance with
24   GAAP.   Deloitte & Touche's opinions falsely represented that Diamond's financial statements
25   complied with GAAP, when Deloitte & Touche knew or negligently disregarded that they did not for
26   the reasons herein alleged.

27       203.   Defendant Deloitte & Touche violated GAAS Standard of Reporting No. 4, which
28   requires, when an opinion on the financial statements as a whole cannot be expressed, that the

1   reasons be stated. Deloitte & Touche should have either stated that no opinion could be issued by

2   them on Diamond's financial statements or issued an adverse opinion stating that the financial

3   statements were not fairly presented.

4       204.   Defendant Deloitte & Touche violated Standard of Field Work No.1 and the standards

5   set forth in AU sections 310, 320 and 327 by, among other things, failing to adequately plan their

6   audit and properly supervise the work of their assistants so as to establish and carry out procedures

7   reasonably designed to search for and detect the existence of errors and irregularities that would have

8   a material effect upon the financial statements.

9       205.   Defendant Deloitte & Touche violated SAS No. 16 in that they failed to perform their

10  examination with an attitude of professional skepticism and, in connection with the audits of

11  Diamond's financials, ignored numerous "red flags" that would reasonably have led to the discovery

12  of the improper accounting of the payments to walnut growers.

13      206.   Defendant Deloitte & Touche violated AU section 316.20, which requires that

14  additional procedures should be performed when evaluation at the financial-statement level indicates

15  significant risk.

16      207.   As a result of the foregoing, Defendant Deloitte & Touche's certification of

17  Diamond's financial statements issued in 2010 and 2011 falsely represented that the statements were

18  audited pursuant to GAAS and that Diamond's financial statements were presented in conformity

19  with GAAP. Deloitte & Touche knew that such certification was false and misleading because, as

20  detailed herein: (a) Deloitte & Touche knew or were negligent in not knowing that the Company's

21  financial statements violated GAAP; and (b) Deloitte & Touche knew they had not complied with

22  GAAS.

23      208.   As a result of the services rendered to Diamond, Deloitte & Touche's personnel were

24  present or should have been present at Diamond's corporate headquarters and major operating

25  offices and examined or participated, or should have examined and participated, in reviews,

26  investigations and audit procedures regarding the financial condition, business operations and

27  financial, accounting and management-control systems of Diamond. In the course of performing

28  such services, Deloitte & Touche had virtually unlimited access to substantial evidential matter

1   revealing the adverse facts about the Company's compliance with finance reporting requirements
2   and laws and the finances of Diamond, but improperly failed to require adjustment for or disclosure
3   of such facts.

4        209.   Deloitte & Touche:  (a) knew or were negligent in not knowing of the material,
5   adverse, non-public information about the financial statements of Diamond, which was not
6   disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements,
7   releases, reports and other public representations of and about Diamond pleaded herein, involving
8   the SEC reports on the 2010 and 2011 Form 10-Ks.

9        210.   In performing auditing and accounting services on behalf of Diamond and engaging
10  in the wrongful acts alleged herein, Deloitte & Touche knew or should have known that their client
11  would, and did, transmit false and misleading financial information to the investing public.
12  However, Deloitte & Touche failed to discharge their duties in adherence to GAAP and GAAS to
13  detect errors and irregularities and/or failed to require correction and disclosure of these errors and
14  irregularities.

15       211.   In performing the auditing and accounting services to Diamond in the manner alleged
16  herein, Deloitte & Touche owed a duty to Diamond and their shareholders to use such skill, care and
17  diligence as other members of its profession commonly exercised.  Deloitte & Touche, however,
18  breached such duty by committing the wrongful acts and conduct alleged herein.

19       212.   Diamond relied to their detriment on Deloitte & Touche and was damaged thereby.
20       213.   As a direct, foreseeable and proximate result of Deloitte & Touche's breach of duties
21  owed to Diamond, Diamond was damaged.

22                          **COUNT VII**

23  **Derivative Claim Against Defendant Deloitte & Touche LLP for Aiding and Abetting**
    **Breaches of Fiduciary Duty**
24
25       214.   Plaintiffs incorporate by reference and reallege each and every allegation contained
    above as though fully set forth herein.
26
27       215.   Defendant Deloitte & Touche aided and abetted the Individual Defendants in
    breaching their fiduciary obligations owed to Diamond resulting in the wrongdoing and damages to
28

1   the Company.  Deloitte & Touche knew or should have known that Diamond's financial statements

2   for fiscal years 2010 and 2011 were materially false and misleading.  Deloitte & Touche also knew,

3   or should have known, that the false and misleading information would be used, in whole or in part,

4   by Diamond to prepare their publicly reported financial results and financial statements.

5   Nevertheless, Deloitte & Touche actively prepared the false and misleading information and thereby

6   aided and abetted the Individual Defendants' breaches of fiduciary duty and their abuse of control,

7   gross mismanagement and violation of their duty of candor to Diamond shareholders, complained of

8   herein.

9   216.   As a direct, foreseeable and proximate result of Deloitte & Touche's aiding and

10  abetting of the Individual Defendants' breaches of fiduciary duty, Diamond has been damaged.

11                          **PRAYER FOR RELIEF**

12  WHEREFORE, plaintiffs pray for judgment as follows:

13  A.   Against all Defendants and in favor of Diamond for the amount of damages sustained

14  by the Company;

15  B.   Directing Diamond to take all necessary actions to reform and improve its corporate

16  governance and internal procedures to comply with applicable laws and to protect the Company and

17  its shareholders from a repeat of the damaging events alleged herein, including, but not limited to,

18  enhancements to and improvements for Diamond's corporate governance policies;

19  C.   Awarding to Diamond restitution from Defendant Deloitte & Touche and ordering

20  disgorgement of all profits, benefits, and other compensation obtained by Deloitte & Touche for its

21  failure to properly audit the Company's financial statements in accordance with professional

22  standards;

23  D.   Awarding to Diamond restitution from the Individual Defendants, and ordering

24  disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

25  E.   Ordering any and all appropriate equitable and/or injunctive relief against the

26  Defendants to the extent that the Company is unable to obtain from such Defendants an adequate

27  remedy at law;

28  F.   Awarding the Company pre-judgment and post-judgment interest;

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    - 78 -

1    G.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable

2 attorneys' fees, accountant fees, expert fees, costs, and expenses; and

3    H.    Granting such other and further relief as the Court deems just and proper.

4

5                                    **JURY DEMAND**

6    Plaintiffs demand a trial by jury.

7

8

9 Dated: March 1, 2012                    ABRAHAM, FRUCHTER & TWERSKY, LLP

10                                         By: /s/ Ian D. Berg
                                               Ian D. Berg, Esq.
11
                                           Ian D. Berg
12                                         Takeo Kellar
                                           12526 High Bluff Drive, Suite 300
13                                         San Diego, CA 92130
                                           Phone: (858) 792-3448
14                                         Fax: (858) 792-3449

15
16                                              -and-

17
                                           Mitchell M.Z. Twersky
18                                         Lawrence D. Levit
                                           Atara Hirsch
19                                         One Penn Plaza, Suite 2805
                                           New York, New York 10119
20                                         Telephone: (212) 279-5050
                                           Facsimile: (212) 279-3655
21
                                           *Attorneys for Plaintiff Board of Trustees of City of*
22                                         *Hialeah Employees' Retirement System*

23
24
25
26
27
28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                      - 79 -

1    Dated: March 1, 2012                        CHAPIN FITZGERALD SULLIVAN &
                                                 BOTTINI LLP
2
                                                 By: /s/ Francis A. Bottini, Jr.
3                                                     Francis A. Bottini, Jr. Esq.

4                                                 Edward D. Chapin
                                                 Francis A. Bottini, Jr.
5                                                 Keith M. Cochran
                                                 550 West "C" Street, Suite 2000
6                                                 San Diego, CA 92101
                                                 Phone: (619) 241-4810
7                                                 Fax: (619) 995-5318

8
                                                 *Attorneys for Plaintiff Dave Lucia*
9

10
     Pursuant to General Order No. 45 Section X(B), all signatories concur in filing this Consolidated
11   Shareholder Derivative Complaint.

12   Dated: March 1, 2012                            By: */s/ Francis A. Bottini, Jr.*
                                                         Francis A. Bottini, Jr., Esq.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                       - 80 -

## VERIFICATION

I, Dave Lucia, verify that I am a shareholder of Nominal Defendant Diamond Foods, Inc. (the "Company"). I have reviewed the allegations made in this Consolidated Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 29, 2012

_____
Dave Lucia

## VERIFICATION

I, Alan W. Voorhees, on behalf of the Board of Trustees of City of Hialeah Employees' Retirement System, declare that I am Chairman of the Board of City of Hialeah Employees' Retirement System, which is a shareholder of Nominal Defendant Diamond Foods, Inc. in this action, and that I have reviewed the allegations made in this Consolidated Shareholder Derivative Complaint (the "Complaint"). I state under penalty of perjury that as to those allegations in the Complaint of which I have personal knowledge, I believe them to be true; as to those allegations in the Complaint of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and, to the best of my knowledge, information and belief, I believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: March O/, 2012

Alan W. Voorhees
on behalf of the Board of Trustees of
City of Hialeah Employees' Retirement
System

Sworn To and Subscribed Before Me This
___/___ day of March 2012

Notary Public

My commission expires: _____

BARBARA C. LINARES
MY COMMISSION # DD 763734
EXPIRES: April 2, 2012
Bonded Thru Notary Public Underwriters

1

**CERTIFICATE OF SERVICE**

2

3          I hereby certify that on March 1, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of the registered users.

4

5          I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 1, 2012.

6

7                                                              /s/ *Francis A. Bottini, Jr.*
                                                              Francis A. Bottini, Jr., Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28