IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DIAMOND FOODS, INC. DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>    All Actions.<br>_____ / | No. C 11-05692 WHA<br><br>**ORDER GRANTING MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION** |

## INTRODUCTION

In this securities derivative action, nominal defendant moves to dismiss for lack of subject-matter jurisdiction and for lack of standing. For the reasons stated below, the motion is **GRANTED**.

## STATEMENT

This is a shareholder derivative action brought by plaintiffs Board of Trustees of City of Hialeah Employees' Retirement System and David Lucia against a number of Diamond Foods, Inc.'s current and former officers and directors, principally based on the company's accounting for payments to walnut growers. This action was previously consolidated. A consolidated shareholder derivative complaint, which is now the operative complaint, was filed.

Diamond sells snack products to global, national, regional, and independent grocery, drug, and convenience store chains, as well as to mass merchandisers and club stores. Plaintiffs Lucia and Board of Trustees of City of Hialeah Employees' Retirement System are current shareholders of Diamond Foods, and have each continuously held Diamond common stock during the relevant period (First Amd. Compl. ¶¶ 24–26). The individual defendants are Michael

J. Mendes, Steven M. Neil, Laurence M. Baer, Edward A. Blechschmidt, John J. Gilbert, Glen C. Warren, Richard G. Wolford, Robert J. Zollars, Robert M. Lea, Dennis Mussel, and the Estate of Joseph P. Silveira (*id*. at ¶¶ 27–36). Other than Mussell and Silveira, at the time of the filing of the consolidated complaint, they composed the current board of the company (*id*. at ¶ 38). Defendants Blechschmidt, Zollars, and Wolford are current members of the audit committee; defendant Warren was a member of the audit committee during a portion of the relevant time period (*id*. at ¶ 139). Defendant Deloitte & Touche LLP, is an accounting firm and served as the company's independent outside auditor during the relevant time period (*id*. at ¶ 39). With regard to the instant motion, nominal defendant Diamond Foods, Inc. is the only moving defendant.

Plaintiffs allege in the consolidated complaint that during the relevant period, defendants caused the company to misrepresent its current financial condition and prospective financial results in proxy statements and other SEC filings, including: (1) the "reported earnings and expenses incurred during the company's fiscal years 2010 and 2011," (2) "fiscal 2012 projected revenue and earnings and the timing thereof," and (3) "the overall shareholder value related to a proposed acquisition of P&G's Pringles business, which was originally scheduled to close by December 2011 (*id*. at ¶¶ 1–4). On April 5, 2011, the company announced that it had entered into a definitive agreement with Proctor & Gamble to merge Proctor & Gamble's Pringles business into Diamond, part of the consideration of which was comprised of company stock (*id*. at ¶ 62). Any decrease in the company's stock price would have made the acquisition less appealing and valuable to Proctor & Gamble (*id*. at ¶ 152). Under the merger agreement, the company was obligated to assume $850 million in debt from Pringles. The amount of debt the company was required to assume could rise by as much at $200 million depending on the company's stock price (*id*. at ¶ 153). Thus, plaintiffs allege, "individual defendants had a strong motive to maintain Diamond's stock price at inflated levels until the acquisition of Pringles was completed" (*ibid*.).

The company made "momentum payments" to walnut growers of $20 million in August 2010 and $60 million in September 2011 (*id*. at ¶ 74; Opp. 2). The company reported $50.2 million in net income for its 2011 fiscal year (*ibid*.) "[H]ad the individual defendants properly

2

accounted for such payments, [the company] would have reported approximately $40 million less in net income for fiscal year 2011" (*ibid*.). Plaintiffs allege that (*id*. at ¶ 5):

> [a]ccounts by confidential witnesses demonstrate that the company's accounting for, and explanation of, alleged 'momentum payments' made in August 2010 and September 2011 were clearly false and represented a basic accounting fraud pursuant to which the company's executives and directors intentionally deferred recognizing substantial expenses (payments to walnut growers for their crops) to the next fiscal year in order to artificially inflate the company's reported profits and earnings per share.

The company had not previously made momentum payments to growers; instead, growers would receive payments in October, January, and March (*ibid*.).

On November 1, 2011, the company issued a press release announcing that its audit committee was conducting an internal investigation into the accounting for the payments made to walnut growers in September 2011 (*id*. at ¶ 7). "[I]t was later reported that it was [Proctor & Gamble], not the current Board or Audit Committee, which insisted that the accounting for those payments be investigated" (*id*. at ¶ 151). Proctor & Gamble wanted the matter resolved before proceeding with the Pringles transaction and Proctor & Gamble delayed the expected close from the end of 2011 until the first half of 2012 (*ibid.*).

After having purportedly investigated the situation regarding the momentum payments to walnut growers, the individual defendants, except Mussell, caused the company to issue a press releases and filings with the SEC falsely stating that the payments were for fiscal year 2012, not fiscal year 2011, and reaffirmed the company's 2012 earning guidance (*id*. at ¶ 78). The October 3, 2011, press release, filed with the SEC on a Form 8-K and approved by all defendants except Mussell, stated (*id*. at ¶ 78):

> Diamond Foods, Inc. made a pre-harvest momentum payment to walnut growers in early September, prior to the delivery of the fall walnut crop to reflect the fiscal 2012 projected market environment. The payment is accounted for in fiscal 2012 costs of goods sold and is reflected in the guidance provided by the company on September 15, 2011.
>
> Diamond reaffirms the guidance provided in its press release dated September 15, 2011, which reflects not only higher commodity costs expected in fiscal 2012, but also recent retail price increases taken for its products.

3

1  Defendants knew or could have easily determined, plaintiffs allege, that the payments were not
2  for fiscal year 2012 by asking the growers who received the payments, which included
3  defendants Gilbert and Lea (*id*. at ¶¶ 129–30).

4  On October 4, 2011, after a meeting with the company management, RBC Capital
5  Markets published a report entitled "'He Said, She Said' — Highlights of Marketing with
6  Management," which conveyed managements' claim that the momentum payments were not
7  designed to pay the walnut growers for the prior year's crop and that investor concerns were
8  unfounded (*id*. at ¶ 79). On November 8, 2011, plaintiffs allege, the company confiscated
9  employees' computers and gave them replacements. "The employees believed that management
10 was attempting to cover-up the wrongdoing" (*id*. at ¶ 86).

11 On November 22, 2011, the company disclosed Silveira, who had served on the audit
12 committee, had died but did not disclose that he committed suicide (*id*. at ¶ 87). The audit
13 committee had assumed responsibility for "conducting an internal investigation into payments
14 made to walnut growers in September 2011 and the accounting for such payments" (*id*. at ¶ 7).
15 It was only after news reports that Silveira had committed suicide came out that the company
16 stated that he had previously been excluded from the investigation because of a potential conflict
17 of interest due to his involvement with walnut growers and cooperatives (*id*. at ¶¶ 88, 91).

18 A high-level company employee, who is unnamed in the consolidated complaint, stated
19 that even if a momentum payment was made, it would need approval by the CEO, CFO, and
20 most likely the Board because of the amounts involved and their "materiality" to the company's
21 financial results (*id*. ¶ at 80).

22 On December 12, 2011, the company filed a press release and Form 8-K stating that the
23 company would be unable to timely file its quarterly financial statement (*id*. at ¶ 11). On
24 December 15, 2011, the company announced it had received a formal order of investigation from
25 the SEC relating to "whether the Company violated accounting rules in connection with
26 payments made to walnut growers" (*id*. at ¶ 12). On January 13, 2012, the U.S. Attorney's
27 Office in San Francisco opened an inquiry into whether financial practices at Diamond involved
28 criminal fraud (*id*. at ¶ 15). On February 8, 2012, the company filed a Form 8-K stating that the

4

company's previously issued consolidated financial statements for the fiscal years ended July 31, 2010 and July 31, 2011 should no longer be relied on because the audit committee had determined that a $20 million payment to walnut growers in August 2010 and a $60 million payment to walnut growers in September 2011 had not been accounted for correctly and that the company had one or more material weaknesses in its internal control over financial reporting (*id.* at ¶ 16). After release of this news, the company's stock went from $36.66 per share on February 8, 2012, to close at $23.13 per share on February 9, 2012 (*ibid.*). The February 8 press release and Form 8-K also stated that Mendes and Neil were placed on administrative leave from their positions as President and CEO, and Executive Vice President, CFO and Chief Administrative Officer, respectively (*id.* at ¶ 17). On February 15, 2012, the company filed a press release and Form 8-K stating that the company and Proctor & Gamble had terminated the Pringles agreement (*id.* at ¶ 18).

The consolidated complaint alleges the following claims against the individual defendants: (1) violation of Section 14(a) of the Exchange Act; (2) breach of fiduciary duty; (3) contribution and indemnification; and (4) gross mismanagement. The complaint alleges the following claim against individual defendants Mendes and Neil: (5) unjust enrichment. The complaint alleges the following claims against defendant Deloitte & Touche: (6) negligence and accounting malpractice; (7) aiding and abetting breaches of fiduciary duty.

Pursuant to the order dated April 12, 2012, the instant motion to dismiss addresses only the issues of lack of demand and lack of subject-matter jurisdiction (Br. 22 n.12). This order follows full briefing and a hearing.

**ANALYSIS**

Nominal defendant moves to dismiss for lack of subject-matter jurisdiction, asserting deficiencies in plaintiffs' claim under Section 14(a) of the Securities Exchange Act and for plaintiffs' failure to plead particularized facts establishing that a pre-suit demand on the company's board of directors would have been futile, arguing that plaintiffs therefore lack standing to pursue claims on the company's behalf. Because this order concludes that the Section 14(a) claim fails, the action is dismissed for lack of subject-matter jurisdiction without

5

any need to consider additional claims.

### 1. SUBJECT-MATTER JURISDICTION.

Plaintiffs allege that the company's directors disseminated materially false and misleading proxy statements in 2010 and 2011 in violation of Section 14(a). Nominal defendant argues that plaintiffs' Section 14(a) claim fails as to the 2011 proxy because (1) it is moot given that the Pringles transaction was not consummated, (2) plaintiffs cannot establish that the proxy was an "essential link" in the accomplishment of the proposed transaction, and (3) plaintiffs cannot establish materiality. This order concludes that the Section 14(a) fails for this last reason. Nominal defendant contends that the Section 14(a) claim fails as to the 2010 proxy because plaintiffs' allegations are insufficient to meet the "essential link" requirement of Section 14(a). This order agrees.

Federal jurisdiction over this action is based on the Section 14(a) claim. To plead a claim under Section 14(a), plaintiffs must allege that: (1) defendants made a material misrepresentation or omission in a proxy statement; (2) with the requisite state of mind; and (3) that the proxy statement was the transactional cause of harm of which plaintiff complains. *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 384 (1970). Plaintiffs must also plead that "the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000). "An omitted fact [in a proxy statement] is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A state of mind of negligence will suffice as to the degree of culpability. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) (Whyte, J).

Plaintiffs' Section 14(a) claim is based on the individual defendants' issuance of the 2010 and 2011 proxy statements, which are alleged to have been false and misleading, in violation of Section 14(a). The proxy statements are addressed in turn.

### A. 2011 Proxy Statement.

Plaintiffs allege that the 2011 proxy statement and the 2011 Form 10-K were false and

6

misleading "because they failed to disclose that Diamond deferred approximately $60 million in payments to walnut growers which were due in the 2011 fiscal year until the first quarter of the 2012 fiscal year, thus decreasing expenses and increasing net income in fiscal year 2011." The proxy statement itself solicited company shareholders to vote in favor of the merger with Proctor & Gamble's Pringles division (First Amd. Comp. ¶¶ 72, 165).

Even if the proxy contained a misstatement, plaintiffs cannot state a claim under Section 14(a) unless the complete transaction was detrimental to the company. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d at 1260–61. Here, however, plaintiffs allege that the Pringles transaction would have been beneficial to the company and that it was the loss of the transaction that damaged the company, not approval of it by shareholder (First Amd. Compl. ¶ 107).

In *McKesson*, Judge Whyte dismissed federal securities law claims that arose from McKesson's acquisition of HBOC. Following the merger, McKesson discovered that HBOC had improperly recognized $327 million in sales. This rendered inaccurate the financial statements in the joint proxy used to solicit the approval of HBOC's shareholders for the transaction. Judge Whyte concluded that even though the proxy contained false financial statements that inflated the company's financial results, such statements were not material as a matter of law because had the true lower financial results been disclosed, they would not have deterred shareholders from supporting the transaction. *McKesson*, 126 F. Supp. 2d at 1259–61. Judge Whyte quoted a decision by the United States Court of Appeals for the Second Circuit, stating:

> [In] the proxy context, this definition of materiality . . . assumes that the omitted information would have influenced a reasonable shareholder against the proposed transaction for which proxies were sought. Here, the omitted information would not have made a reasonable shareholder any less likely to favor the objected-to transactions, and such an omission, material or not, could not have caused the injury for which damages are sought.

"[N]either logic nor precedent" supported the proposition that a claim could be stated where "correction or disclosure would only redouble the [shareholder's] resolve to enter into the proposed transaction." *Id*. at 1260–61.

7

This Court adopts the view of Judge Whyte in *McKesson,* believing it to be applicable to Section 14(a) claims, just as it was to a Section 11 claim in *McKesson*. Plaintiffs allege that the Pringles transaction would have been beneficial to Diamond. Had Diamond reported lower financial results, Diamond shareholders would have been more supportive of the deal, not less. On this point, plaintiffs cite to no decisions contrary to *McKesson*.

Plaintiffs assert that "[a]lthough the Pringles acquisition as envisioned, was expected to be beneficial to the Company, the 2011 Proxy Statement was materially false, tainting the vote, and casting doubt on whether truthful information would have caused shareholders to support it (Opp. 21). Plaintiffs speculate that "[h]ad the truth been provided and Diamond's fiscal year 2011 earnings been rightfully reported as being substantially lower, Diamond's stock price likely would have been lower and Diamond would have had to assume a much larger debt burden to consummate the transaction," making it "more likely Diamond shareholders would have voted against share issuance had the truth been disclosed" (Opp. 21–22). This *argument* is at odds with the allegations in the consolidated complaint which state that, "Diamond has lost the substantial benefits that were to come from the Pringles transaction, which among others things, was going to transform Diamond into the second largest snack food company" (First Amd. Compl. ¶ 107). Indeed, plaintiffs have admitted that the acquisition would have been beneficial.

Plaintiffs attempt to distinguish *McKesson* on the ground that Judge Whyte's discussion of materiality was in the portion of the opinion addressing claims under Section 11 of the 1933 Act. Plaintiffs cite to no difference between the materiality standard under Section 11 and Section 14(a). Indeed, for both Sections 11 and 14(a) an omission is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *See TSC Indus., Inc*, 426 U.S. at 449 (Section 14(a)); *In re McKesson,* 126 F. Supp 2d at 1259 (Section 11).

Plaintiffs further argued and emphasized at oral argument that the Section 14(a) claim should be allowed to proceed even if the underlying transaction did not go forward because plaintiffs incurred damages from the 2011 proxy, such as paying a registration fee to the SEC and costs in connection with the planned integration. Plaintiffs relied on *Wininger v. S.I. Mgmt.*

8

*L.P.*, 33 F. Supp. 2d 838 (N.D. Cal. 1998) (Wilken, J.), and *CNW Corp. v. Japonica Partners, L.P.*, 776 F. Supp. 864, 869 (D. Del. 1990), in support of this argument. But both decisions are readily distinguishable. In *Wininger*, Judge Claudia Wilken concluded that the misleading proxy claim would be considered even though the proposed transaction had been withdrawn because plaintiff had incurred expenses responding to the misleading proxy, including re-solicitation of proxies to correct prior misleading statements. *Id*. at 845–46. Similarly, in *CNW*, the court held that the plaintiff could recover expenses it had incurred in responding to an allegedly illegal proxy solicitation. 776 F. Supp. at 869. Here, plaintiffs incurred no expenses responding to the proxy. There was no re-solicitation.

The reasoning in *McKesson* is persuasive. Plaintiffs cannot show materiality. Therefore, the Section 14(a) claim, to the extent it is based on the 2011 proxy statement fails.

**B.    2010 Proxy Statement.**

Plaintiffs allege that the 2010 proxy statement and 2010 Form 10-K were "materially false and misleading because they failed to disclose that Diamond deferred approximately $20 million in payments to walnuts growers which were due in the 2010 fiscal year" (First Amd. Compl. ¶ 164). Instead, the 2010 proxy statement stated that the "company's annual report filed on the 2010 Form 10K was in compliance with GAAP and that the company maintained effective control over financial reporting" (First Amd. Compl. ¶ 164).

There was no specific transaction subject to this proxy. Plaintiffs contend, however, that the proxy statement is actionable under Section 14(a) because "it contained false financial information that influenced the vote to re-elect the directors who were up for election and allowed for the ratification of the appointment of Deloitte & Touche LLP as auditors" (Opp. 22). But the re-election of directors who have allegedly mismanaged the company is insufficient to meet the "essential link" requirement of Section 14(a).

A "claim that the reelection of the directors was an essential link to loss-generating corporate action because of the directors' subsequent mismanagement" cannot form the basis of liability under Section 14(a). *Kelley v. Rambus*, *Inc*. 2008 WL 5170598 at *8 n.8 (N.D. Cal. 2008) (Fogel, J.). Plaintiffs do not address *Kelley*, except to state that their claim is not one of

9

mismanagement but rather one of self-dealing, which is presumptively material. *See Gaines v. Haughton*, 645 F.2d 761, 776-77 (9th Cir. 1981). But plaintiffs' allegations concerning the 2010 proxy are devoid of allegations of self-dealing. The allegations focus on mismanagement accounting for walnut payments (First. Amd. Compl. ¶¶ 54–56, 164). Thus, there is no basis to find liability under plaintiffs' asserted theory, and plaintiffs do not assert another basis for liability. Furthermore, there can be no liability for a Section 14(a) claim based on a theory of mismanagement. Thus, plaintiffs' Section 14(a) claim fails to the extent it is based on the 2010 proxy statement.

The Section 14(a) claim fails as to both the 2010 and 2011 proxies. Subject-matter jurisdiction was premised on that federal claim. The Court will not exercise supplemental jurisdiction over the remaining state law claims. In light of the fact that there are almost identical state suits pending before Judge Richard Kramer, it would be duplicative to reach these issues here in federal court. Therefore, there is no subject-matter jurisdiction.

**2.    REQUESTS FOR JUDICIAL NOTICE.**

Nominal defendant requests judicial notice of specified SEC filings and public documents filed with the SEC and the Secretary of State of the State of Delaware. FRE 201. The request for judicial notice is **GRANTED**.

Plaintiffs request judicial notice of specified documents filed with the SEC. FRE 201. The request for judicial notice is **GRANTED**.

**CONCLUSION**

For the above-stated reasons, the motion to dismiss is **GRANTED**. Leave to amend would be futile. No action will be taken on defendant Deloitte's motion to compel arbitration and to

10

dismiss or stay the action as there is no subject-matter jurisdiction over this derivative action. The **CLERK** shall close the case file.

**IT IS SO ORDERED.**

Dated: May 29, 2012.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE